675 F.2d 168
 Blue Sky L. Rep. P 71,731, Fed. Sec. L. Rep. P 98,628,
10 Fed. R. Evid. Serv. 252
Dr. Roger E. AUSTIN, Dr. Thomas W. Anderson, Dr. Myrel A.
Neumann and Dr. William C. Randall, Plaintiffs,
Appellees and Cross Appellants,
v.
B. J. LOFTSGAARDEN; Alotel Incorporated, a Minnesota
Corporation; M. S. Noah; Lyman H. Coult; Property
Development & Research Company, a Minnesota Corporation; and
2361 Building Corporation, a Minnesota Corporation,
Defendants, Appellants and Cross Appellees.
 Nos. 80-1771, 80-1874.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 17, 1981.
Decided April 7, 1982.
 
 1
 Fredrikson, Byron, Colborn, Bisbee & Hansen, John A. Grimstad, Terrence M. Fruth, Minneapolis, Minn., for Austin, Anderson and Neumann.
 
 
 2
 O'Connor & Hannon, Douglas M. McMillan, Robert A. Brunig, Minneapolis, Minn., for Randall.
 
 
 3
 Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Clyde F. Anderson, Laura S. Underkuffler, Minneapolis, Minn., for defendants, appellants and cross appellees.
 
 
 4
 Before McMILLIAN and ARNOLD, Circuit Judges, and HANSON*, Senior District Judge.
 
 
 5
 HANSON, Senior District Judge.
 
 
 6
 Plaintiffs-appellees are four of twenty-two limited partners who invested in a development to build and operate a Ramada Inn motel in Rochester, Minnesota. In the district court they prevailed on various claims that they were defrauded by defendants-appellants B. J. Loftsgaarden and three of his closely-held corporations because of misrepresentations, half-truths, and omissions that were found to exist in the Offering Memorandum used to attract plaintiffs to the project.[1] A jury found Loftsgaarden and the corporate defendants (hereinafter Loftsgaarden) liable upon claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b-5, 17 C.F.R. § 240.10b-5; the antifraud provisions of the Minnesota Securities Act, Minn.Stat. §§ 80A.01 et seq., 80A.23; and common law fraud.[2] The jury also rendered an advisory verdict-in which the district court concurred-that defendants were liable for violating § 12(2) of the Securities Act of 1933. 15 U.S.C. § 77l (2).[3] The district court applied a rescissory remedy, which resulted in an award to plaintiffs in the amount of the consideration that each had paid for his limited partnership unit or units, prejudgment interest from the date of purchase, and attorneys' fees for plaintiffs Randall and Neumann for a total judgment of $273,720. Defendants raise a number of issues on appeal mainly relating to the sufficiency of evidence on the essential elements of these claims and the measure of damages. Plaintiffs cross-appeal from the district court's denial of certain portions of their requested attorneys' fees. We affirm as to the finding of liability, but remand for further consideration on the issue of damages.
 
 I.
 
 7
 B. J. Loftsgaarden is an attorney and the president and sole shareholder of corporate defendants Alotel, Inc., Property Development and Research Company (PDRC), and 2361 Building Corporation. Through these corporations, Loftsgaarden intended to build and operate a Ramada Inn in Rochester, Minnesota.[4] To help finance the $3.5 million project, he organized a limited partnership, Alotel Associates, through which he expected to raise $1 million by selling 40 limited partnership units to not more than 20 investors for $25,000 per unit. The remainder of the money was to be obtained through a $2.31 million mortgage loan from Larwin Realty and Mortgage Trust[5] and a $240,000 furniture and fixtures loan from the First National Bank of Rochester. Loftsgaarden and Alotel, Inc., were to serve as the project's general partners.
 
 
 8
 In December 1971, Loftsgaarden prepared an offering memorandum through which he hoped to interest investors in the limited partnership units. The memorandum indicated that the partnership would "operate as a 'tax shelter' ", leading to "significantly greater returns for persons in relatively high income tax brackets." Accordingly, the memorandum outlined "Investor Suitability Standards" requiring that each investor have a net worth in excess of $200,000 excluding home and automobiles or that some portion of the investor's income was subject to federal and state income taxes at a rate of fifty percent or more. Paul Crawford, an investment advisor whom Loftsgaarden knew was not licensed to act as such, agreed to help Loftsgaarden find suitable high income investors.
 
 
 9
 The attraction of such an investment to high tax bracket individuals lies in the tax treatment of the partnership's income and losses. Because the partnership is not taxed as an entity, it serves as a conduit to the partners for all its taxable income and losses. I.R.C. §§ 701, 702. Each partner is permitted to take his or her share of the partnership's deductible losses "to the extent of the adjusted basis of such partner's interest in the partnership...." I.R.C. § 704(d). But in a real estate investment such as the one contemplated by Loftsgaarden, the limited partner's basis is not restricted to the amount of his actual investment (the amount "at risk"); rather, it may be increased by the partner's proportional share of any nonrecourse loans made to the partnership. See I.R.C. § 465(c)(3)(D). Against such an increased basis, a limited partner is able to receive from the partnership deductible losses far in excess of the amount he or she has at risk in the investment. By using accelerated methods of depreciation, prepaying interest on loans, renting instead of purchasing land, and other methods, the partnership is able artificially to generate large amounts of deductible losses and expenses in the early years of the venture which are passed on to the partners to use in offsetting other income on their individual tax returns.[6] The result is that a limited partner can often recoup his money in the year of his investment through tax savings. Generally the tax shelter serves only to defer taxation until the investment is liquidated and each partner receives his or her proportional share of the proceeds of the sale. Any gain realized will be taxed partly at capital gains rates (assuming the greater than one year holding period has been satisfied) and partly at ordinary income rates (to the extent that the accelerated depreciation taken exceeds the amount that would have been taken if a straight-line method were used). I.R.C. §§ 1231, 1250.
 
 
 10
 Under the terms of Loftsgaarden's offering memorandum, Alotel Associates planned to employ some of the above-described methods to provide immediate tax savings to the limited partners. The $2.31 million loan from Larwin would be a nonrecourse loan, thus serving to increase each limited partner's investment basis. In addition, rapid depreciation methods would be used to generate large deductible losses in the early years of the investment. Despite these features, only one person was willing to make the $50,000 minimum investment. This forced Loftsgaarden to terminate the offering and revise the project to further enhance the tax benefits and reduce the minimum price per investor. Instead of purchasing land as originally contemplated, the partnership would rent land thereby incurring another tax deductible expense.[7] Since capital was no longer required to purchase land, the amount of money Loftsgaarden needed to raise through the sale of limited partnership units was reduced from $1 million to $700,000. This also reduced the minimum investment per limited partner from $50,000 to $35,000 and the total number of units from 40 to 20.
 
 
 11
 In May 1973, Loftsgaarden revised the offering memorandum to reflect these changes. An accounting forecast included in the memorandum stated that the partnership would suffer losses resulting in income tax savings during its first three years; thereafter the business would begin to show a profit. Again Crawford aided Loftsgaarden in finding suitable high income investors. This time the offering proved successful. In the summer and fall of 1973, plaintiffs-Drs. Roger Austin, Thomas Anderson, Myrel Neumann, and William Randall-were among those who purchased units.[8] The jury found that plaintiffs bought their units in reliance on the representations made in Loftsgaarden's offering memorandum and upon the advice of either Crawford[9] or their own financial advisors who in turn relied on the memorandum.
 
 
 12
 Among other matters, the offering memorandum represented that Loftsgaarden could obtain interim construction financing for the motel at an interest rate of nine and one-half percent; that the construction loan interest would amount to $130,000; that the land lease would run for forty years with renewal and purchase options; that construction of the motel would begin in May 1973 and be completed seven months later in December 1973; that the developer and the construction company (i.e., Loftsgaarden and 2361) would receive $103,000 for "overhead and profit"; that the $240,000 furniture and fixtures loan from the Rochester bank would be at an interest rate of eight percent; and that Alotel Associates had procured a firm commitment for long term financing[10] from Larwin. Findings of Fact, Conclusions of Law, and Order for Judgment, Designated Record (D.R.) 445-59.[11]
 
 
 13
 These representations were found to be false. In fact, Loftsgaarden had not obtained either the interim construction loan or the furniture and fixtures loan at the stated fixed interest rates, but rather at interest rates that floated four and three percent respectively above the prime lending rate. The land lease was for fifteen years with a fifteen-year renewal option instead of forty years with renewal and purchase options. Loftsgaarden knowingly underestimated the construction time by five months, thus the memorandum's estimate that construction loan interest would amount to $130,000 was too low because it was based on a lower interest rate and a shorter construction time than actually expected. It was also not true that he had a firm commitment from Larwin for the partnership's permanent financing. The loan was contingent upon Larwin receiving adequate assurance that it was not usurious under Minnesota law.[12] Overall, the budgets and forecasts in the offering memorandum were found to be based on unreasonable and misleading assumptions.
 
 
 14
 Additionally, it was found that Loftsgaarden had omitted any explanation of the role his closely-held corporations would assume in the development. He did not reveal that PDRC expected to earn a profit on the various land transactions required to set up the sale-leaseback arrangement, that PDRC would receive a commitment fee for having obtained financing for the partnership, and that he owned a thirty percent interest in ARC-TEC-the architectural firm with which he contracted to design the motel. Overall, it was clear that Loftsgaarden and the corporate defendants expected compensation considerably greater than the $103,000 stated in the offering memorandum, their expectation being more on the order of $240,000.
 
 
 15
 Alotel Associates encountered financial difficulties from the project's inception. Construction costs exceeded those budgeted, largely because of ever-increasing interest rates.[13] When the motel finally opened in June 1974, operating expenses exceeded those that were forecast and occupancy rates fell short of expected levels. Exacerbating matters was Larwin's refusal to "take out" (supra note 5) the interim construction loan upon completion of construction because it had not received adequate assurances that its loan to the partnership was legal under the Minnesota usury law. Loftsgaarden was not able to placate Larwin and get the permanent financing in place until December 1974, resulting in an additional six months of high interest charges to the partnership. Loftsgaarden sold five additional units in Associates in October 1974 to raise $175,000 for repayment of debts and additional operating capital. In February 1975 Loftsgaarden asked the limited partners to make $125,000 in loans to keep Associates afloat. The limited partners hired an accountant, John Essene, to investigate the partnership's financial condition. Essene reported in March that in fact $200,000 would probably be required to continue business operations. Plaintiffs and other limited partners did make loans to Associates at this point,[14] but they also hired an attorney to make further investigation of the partnership's financial affairs. The district court found that by August or September 1975, plaintiffs knew or should have known of defendants' fraud. In September, Loftsgaarden agreed to resign as general partner; thereafter plaintiffs made additional loans to Associates, but the business continued to flounder. Associates ultimately defaulted on its loans and land rent payments and foreclosure by creditors ensued.
 
 
 16
 Plaintiffs filed their complaint on February 24, 1976. On June 25, 1980, after a seven-day trial, the jury found that Loftsgaarden knowingly had made material misrepresentations and omissions in the offering memorandum upon which plaintiffs relied and which caused plaintiffs' damages, thus satisfying all the elements of the § 10(b), Rule 10b-5, Ch. 80A, and common law fraud claims.[15] The district court also accepted the jury's advisory verdict that Loftsgaarden was liable under § 12(2) because he knowingly made material misrepresentations or omissions of which plaintiffs were unaware, and because there was some causal connection between Loftsgaarden's wrongful conduct and plaintiffs' purchases.[16] See Alton Box Board Co. v. Goldman, Sachs & Co., 560 F.2d 916 (8th Cir. 1977).
 
 II.
 
 17
 Loftsgaarden complains that there is insufficient evidence of materiality, reliance or causation to sustain the jury's verdict upon plaintiffs' § 10(b), Rule 10b-5, Ch. 80A, and common law fraud claims. It is also claimed that the district court's findings of materiality and causation in support of its conclusion that liability existed under § 12(2) are clearly erroneous.
 
 A.
 
 18
 A statement or omitted fact is considered material if it is substantially likely that a reasonable investor would consider the matter important in making an investment decision. TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).[17] Whether or not the misrepresented or omitted fact is important turns on whether a reasonable investor would regard it as significantly altering the total mix of information made available. Id.
 
 
 19
 Leaving aside the relatively few misrepresented and omitted matters which Loftsgaarden claims are unsupported by the evidence, we focus upon what we regard as his primary challenge to the materiality finding. Loftsgaarden in effect admits that the following facts were either misrepresented in or omitted from the offering memorandum, but he argues that these facts should be deemed immaterial: Loftsgaarden held a 30% interest in ARC-TEC; the partnership was to pay a $25,000 brokerage fee in conjunction with the sale of land; the project was a revision of a prior failed offering by Loftsgaarden; Crawford was an unlicensed seller; the interest rate on the interim construction loan floated at four percent over the prime rate; the land lease was for a shorter term than represented; the furniture and fixtures loan was to be secured by a chattel mortgage; the permanent financing from Larwin was contingent upon assurances that it would not be usurious; the corporate general partner was an unfunded shell corporation; Loftsgaarden stood to gain over twice the profits stated; and the offering, while not required to be registered with the state, would have failed to qualify had registration been sought.
 
 
 20
 The jury applied the proper standard of materiality and found that full disclosure of the above matters would be regarded as important by a reasonable investor. The Supreme Court has recognized that the trier of fact is uniquely competent to make the materiality determination, requiring as it does "delicate assessments of inferences a (reasonable investor) would draw from a given set of facts ...." Id. at 450, 96 S.Ct. at 2132. We cannot fault the jury's assessments in this case and we uphold the materiality finding.
 
 B.
 
 21
 Ordinarily, reliance requires proof that the misrepresentations actually induced plaintiffs to act differently than they otherwise would have in making their investment decisions. St. Louis U. Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 562 F.2d 1040, 1048 (8th Cir. 1977), cert. denied, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978). But in cases involving primarily a failure to disclose, reliance will be presumed upon a showing that the withheld information was material. Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). Because there were both misrepresentations and omissions in the offering memorandum, Loftsgaarden requested and the jury was given a dual instruction which stated that plaintiffs had the burden of proving they relied on the misrepresentations, but that as to the omissions, reliance was presumed upon a showing of the materiality of the omitted facts.[18]
 
 
 22
 Loftsgaarden contends that there is no evidence to support a finding of reliance in this case. On the contrary, the record indicates that the only information received by plaintiffs came from the offering memorandum. Austin testified that he went over the offering memorandum with Crawford, devoting particular attention to the forecast of cash flow, and that the memorandum "was the principal reason, I would say, that I invested in it." T. 557. Likewise, Anderson testified that he read and made notes on the offering memorandum and that it was "the extent of the information I did have at the time I invested." T. 591. Randall relied on the advice of his accountant, John Essene, who testified, "All I had to work with was the offering circular.... It was really the only source of information that was available." T. 494. Neumann relied on the advice of his accountant and business partner, Delroy Blaske, who reviewed and analyzed the offering memorandum, particularly focusing on the forecasts. Blaske testified the offering memorandum was "all we had to go on." T. 568.[19]
 
 
 23
 Loftsgaarden argues that there is no evidence plaintiffs actually were misled by any of the specific aspects of the offering memorandum that were found to have been misrepresented. But misrepresentations so permeated this document that the trial court found their cumulative effect was to render the forecasts and projections unreasonable and misleading.[20] Accordingly, reliance could be found from evidence that plaintiffs' only source of information in making their investment decisions was the offering memorandum.
 
 
 24
 It is next argued that the trial court erred in failing to instruct that the presumption of reliance upon material omitted facts is rebuttable. This point would be more troublesome were we confronted with a situation where the only reliance instruction given was a presumption instruction. In such a case, we think it is necessary that defendant be allowed to rebut the presumption of reliance and that the jury be instructed on the rebuttable nature of this presumption. See Sharp v. Coopers & Lybrand, 649 F.2d 175, 189 (3d Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1427, 71 L.Ed.2d ---- (1982); Shores v. Sklar, 647 F.2d 462, 476 (5th Cir. 1981), petition for cert. filed, --- U.S. ----, 102 S.Ct. 1424, 71 L.Ed.2d ---- (1981); St. Louis U. Trust Co., supra at 1049. But we hold that Loftsgaarden suffered no prejudice in the instant case by the omission of the rebuttability instruction because, independent of any presumption of reliance that may have been made, the jury found that plaintiffs affirmatively proved reliance.[21]
 
 C.
 
 25
 Causation requires a showing of "some causal nexus between the defendant's wrongful conduct and (plaintiff's) loss." St. Louis U. Trust Co., supra at 1048. Loftsgaarden contends that there is no connection between the misrepresentations and omissions in the offering memorandum and the eventual foreclosure of the motel.[22] The theory advanced appears to be something akin to a contributory negligence defense, in which Loftsgaarden claims that it was acts by plaintiffs themselves that caused foreclosure of the motel. Our answer to this is simply that any direct contribution made by plaintiffs to the demise of the project after they ousted Loftsgaarden as general partner does not relieve him from liability for his own intentional tortious acts. The evidence shows that the numerous misrepresentations and omissions-particularly those relating to financing-unquestionably caused the project to be launched on unsound financial footing. This in itself is sufficient evidence to establish causation. Loftsgaarden is not to be excused from liability because of plaintiffs' inability to extract themselves from a predicament for which he was squarely to blame.
 
 D.
 
 26
 Thus, we uphold the finding of liability on § 10(b), Rule 10b-5, Ch. 80A, and common law fraud. On the basis of the foregoing discussion, we also hold that no clear error exists in the lower court's findings of materiality and causation in support of its conclusion that liability exists under § 12(2). As previously stated, the materiality standard is the same under all the securities statutes. Alton Box Board Co. v. Goldman, Sachs & Co., supra at 919-20. Causation under § 12(2) is shown by demonstrating "some causal relationship" between the misrepresentations or omissions and plaintiffs' purchases. Id. at 924. We are nowhere left with the "definite and firm conviction that a mistake has been committed" regarding either of these findings. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).
 
 
 27
 In addition, we reject Loftsgaarden's argument that rescission under § 12(2) was not an available remedy to plaintiffs because no timely demand for rescission nor timely tender of the limited partnership units was made. We do not read § 12(2) as requiring any demand for rescission. All that is required is that the claim be made within the applicable statute of limitations, § 13 of the 1933 Act, 15 U.S.C. § 77m. Section 13 requires that actions brought under § 12(2) must be brought within one year after the untrue statement or the omission is discovered or should have been discovered and that in no event may an action be brought more than three years after the sale. But even an untimely claim raised under § 12(2) may survive if it is raised in accordance with the relation back rule. Rule 15(c), F.R.Civ.P.; see Gridley v. Cunningham, 550 F.2d 551, 553-54 (8th Cir. 1977); Gannett Co. v. Register Pub. Co., 428 F.Supp. 818, 823 (D.Conn.1977); Wassel v. Eglowsky, 399 F.Supp. 1330, 1358-59 (D.Md.1975), aff'd, 542 F.2d 1235 (4th Cir. 1976); cf. Straley v. Universal Uranium and Milling Corp., 289 F.2d 370, 372-73 (9th Cir. 1961) (relation back of amendment stating claim under § 12(1)).
 
 
 28
 It is undisputed that plaintiffs' original complaint, filed on February 26, 1976, was timely. The complaint alleged violations of § 10(b), Rule 10b-5, and Minnesota securities law. The § 12(2) claim was raised in subsequent amendments to the complaint filed on December 26, 1978, and May 18, 1979. It is also undisputed that the § 12(2) claim "arose out of the conduct, transaction, or occurrence set forth ... in the original pleading." Rule 15(c), F.R.Civ.P. Accordingly, the § 12(2) claim was timely raised because the amendments related back to the date of the original pleading. Id. See generally C. Wright & A. Miller, Federal Practice and Procedure § 1497 at 499-500 (1971).
 
 
 29
 Nor are we persuaded that plaintiffs' claim under § 12(2) should be barred because no tender of the limited partnership units was made until shortly before trial. No time for tender is prescribed by § 12(2) and this circuit has held that a tender prior to or during trial satisfies the requirement. Gridley v. Cunningham, supra at 554; see also Wigand v. Flo-Tek, Inc., 609 F.2d 1028, 1034-35 (2d Cir. 1979).
 
 III.
 
 30
 Before addressing damages, we briefly consider and reject two tangential points raised by Loftsgaarden. One point concerns an allegedly prejudicial remark made by the court to Loftsgaarden's counsel. At the end of the first day of trial, the court limited counsel's cross-examination of Crawford to an amount of time equal to that consumed by plaintiffs in their direct examination. When counsel for Loftsgaarden balked, the court stated, "I don't want to be critical but you spent 15 minutes on minor historical meetings." T. 143. The following day, Loftsgaarden moved for a mistrial alleging the court's comment constituted judicial misconduct, irreparably prejudicing the rights of the defendants. It is claimed the lower court erred in denying the motion. We cannot say that such an incidental remark in any way reflected any conscious or unconscious desire on the part of the trial court to deprive Loftsgaarden of a fair trial. Cf. Agee v. Lofton, 287 F.2d 709, 710 (8th Cir. 1961) ("(The trial judge's) remarks making light of the plaintiffs and their witnesses were, in our opinion, calculated to prevent the plaintiffs from having the sort of trial to which they were legally entitled."). Furthermore, any possible prejudice was cured by the court in its instructions to the jury.[23]
 
 
 31
 The second point raised is that the lower court abused its discretion in permitting plaintiffs to introduce evidence of a prior fraud committed by Loftsgaarden. After Loftsgaarden denied any intent to defraud plaintiffs, the court permitted plaintiffs to rebut this testimony by introducing evidence of a 1976 state court determination that Loftsgaarden had defrauded a party in a real estate transaction. The lower court concluded that the evidence was probative of intent and that its value in this regard outweighed any prejudice. See Fed.R.Evid. 403. A limiting instruction was given in which it was made clear that the evidence "was received only as it may relate to (Loftsgaarden's) intent and for no other purpose." Once Loftsgaarden denied any intent to defraud, it was within the trial court's discretion to permit evidence of the prior fraud. See Fed.R.Evid. 404(b). We hold that the court did not abuse its discretion in allowing this evidence to be placed before the jury.
 
 IV.
 
 32
 The most hotly contested issue in this case concerns the district court's ruling that Loftsgaarden could not introduce any evidence about the tax benefits accruing to plaintiffs as a result of their participation in Alotel Associates. Loftsgaarden argues that the evidence was crucial to the issue of whether plaintiffs, regardless of whether they had been defrauded, suffered any actual damages.
 
 A.
 
 33
 "(D)amages for securities fraud are determined in accordance with the extent to which false and misleading information actually harmed the complaining party...." Shapiro v. Midwest Rubber Reclaiming Co., 626 F.2d 63, 69 (8th Cir. 1980), cert. denied, 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981); cf. 15 U.S.C. § 78bb(a) (limiting plaintiff's recovery under the 1934 Act to "actual damages on account of the act complained of"). Failure by the complaining party to prove actual damages is fatal to the party's claim. Shapiro, supra at 70. Generally, the out-of-pocket measure of damages is applied in securities fraud cases, usually awarding plaintiff (in the case of a defrauded purchaser) the difference between the purchase price of the security and its actual value on the date of purchase.[24] Harris v. American Investment Co., 523 F.2d 220, 225 (8th Cir. 1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976). This measure, however, is "not a talisman"; the function of the court "is to fashion the remedy best suited to the harm." Garnatz v. Stifel, Nicolaus & Co., 559 F.2d 1357, 1360 (8th Cir. 1977), cert. denied, 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978). Accordingly, a rescissional remedy, id., or some other measure of damages in the nature of restitution may be applied. Cf. Myzel v. Fields, 386 F.2d 718, 742-43 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) ("Rescission calls for cancellation of the bargain, and the return of the parties to the status quo ante ; ... (b)ut where there exists no market value of the stock, the stock is no longer in existence, and there clearly has been a fluctuation in value ..., then what restitutional damages are to be awarded must depend upon the facts of the particular case.").
 
 
 34
 The actual damages principle requires that a rescissional or restitutional award be "reduced by any value received as a result of the fraudulent transaction." Garnatz v. Stifel, Nicolaus & Co., supra at 1361. This principle applies in the instant case not only to the § 10(b) and Rule 10b-5 claims, but also to the claims under § 12(2) and Minnesota law. Under § 12(2), the defendant guilty of prospectus fraud shall be liable to plaintiff,
 
 
 35
 who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
 
 
 36
 15 U.S.C. § 77l (emphasis added). Similarly, the Supreme Court of Minnesota holds that the defrauded party is entitled to no recovery unless plaintiff is able to prove that he suffered actual damages as a result. Berg v. Xerxes-Southdale Office Bldg. Co., 290 N.W.2d 612, 615 (Minn.1980); cf. Minn.Stat. § 80A.23 (limiting recovery to actual damages sustained for violation of state securities laws).
 
 
 37
 At trial, Loftsgaarden attempted to show that in spite of any fraud he may have perpetrated, plaintiffs suffered no actual damages because of the tangible economic benefit they derived from the limited partnership units in the form of large tax write-offs which they used to offset their sizeable professional incomes. Loftsgaarden's offer of proof indicates that he was prepared to introduce evidence that three of the four plaintiffs suffered no actual damages on account of the tax savings they experienced from the investment. The district court stated that it was "not going to get into a lot of complicated tax testimony" (T. 23), and disallowed the evidence, dismissing the argument as "sophistic malarky." D.R. 438. The court concluded that the limited partnership units were worthless and instructed the jury that if they found liability, the measure of damages would be the amount "which the plaintiffs paid out in reliance upon the false representations of (the) defendant ...." T. 805. We take no issue with the court's decision to apply what was essentially a rescissory measure of damages in this case,[25] but we hold that the court committed reversible error in refusing to allow proof of any economic benefits received by plaintiffs on account of the investment and in failing to instruct the jury that the damage award must be reduced by any value shown to have been received by plaintiffs.
 
 B.
 
 38
 We have already explained the basic principles of a real estate tax shelter investment in Part I of this opinion. The aim is to generate large amounts of artificial losses in the early years of the investment which may be passed on to the limited partners for use in offsetting their outside income. The ultimate goal, of course, is to establish a positive cash flow and become an income-producing enterprise, which income-just as the early losses-is distributed proportionately to the limited partners. Thus the benefits from a profitable real estate tax shelter investment are two-fold, offering tax savings to the limited partner in its early years and generating income in later years. But unlike a corporate shareholder, for example, even if the enterprise fails to become profitable, the limited partner clearly may have something of value because of the investment's unique tax treatment:
 
 
 39
 A limited partner who has been misled into investing in an unprofitable real estate venture may be in a better position than a shareholder in an unprofitable corporation. By use of depreciation, real estate limited partnerships can generate a substantial tax loss while actually taking in sufficient cash to cover partnership expenses. This tax loss can be passed through to the partners as a shelter for other taxable income. In the extreme case where the partnership's gross rents are exactly equal to its expenditures, the tax loss continues to make the partnership an attractive investment. On the other hand, the stock of a corporation having no profit or prospects of profit would be worthless, and a shareholder in that corporation would value any recovery in a civil suit more than his investment.
 
 
 40
 Note, Real Estate Limited Partnerships and Allocational Efficiency: The Incentive to Sue for Securities Fraud, 63 Va.L.Rev. 669, 672-73 (1977) (footnotes omitted). We note that the above excerpt discusses the value of the limited partnership interest in a break-even investment. Whether or not the costs exceeded the benefits in the instant case where the enterprise never even reached the break-even point cannot be determined absent evidence on the matter.
 
 
 41
 The few recent cases addressing the issue hold that in private securities fraud actions brought by limited partners in real estate tax shelter investments, consideration of tax benefits received by the limited partners is relevant to the question of whether plaintiffs suffered any actual damage. In Bridgen v. Scott, 456 F.Supp. 1048 (S.D.Tex.1978), limited partners sued the general partner under § 10(b) and Rule 10b-5 after they received tax benefits, but no profit upon a speculative real estate investment. The court permitted defendant to introduce evidence of the tax aspects of the investment:
 
 
 42
 Requiring the jury or this Court to try this case without reference to the tax consequences of the transaction would be requiring the jury and the Court to live in an artificial "never-never land." The plaintiffs' position that the tax consequences of this transaction should be ignored is simply not realistic and is tantamount to requesting this Court and the jury to try this case blindfolded.
 
 
 43
 Id. at 1061. The court held that application of a rescissory damage measure would require reduction of the price paid by the specific value received by plaintiffs in the form of tax write-offs. Id. at 1060. In Smith v. Bader, 83 F.R.D. 437 (S.D.N.Y.1979), the court permitted discovery of plaintiffs' tax returns, holding that "knowledge of plaintiffs' income tax rate and the net value of their investment, along with other information, may be needed to calculate any tax benefits which may mitigate damages." Id. at 439. Similarly, in Berg v. Xerxes-Southdale Office Bldg. Co., supra, at 615, the court held that in valuing the interest in a real estate limited partnership, income tax considerations are relevant. Cf. Dupuy v. Dupuy, 551 F.2d 1005, 1025 (5th Cir.), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); Bayoud v. Ballard, 404 F.Supp. 417, 426 (N.D.Tex.1975); Hickman v. Groesbeck, 389 F.Supp. 769, 779-80 (D.Utah 1974). Indeed, the tax aspects of a real estate limited partnership investment are of such tangible economic benefit to the investor that damages are recoverable under the securities laws where, on account of fraud by the offeror, tax write-offs taken by the investor are disallowed by the Internal Revenue Service. Sharp v. Coopers & Lybrand, supra. Thus, we acknowledge the value of the tax deductions generated by such an investment and hold that the strictly compensatory nature of damages awardable in private securities fraud actions requires that such value be taken into account in determining whether and to what extent damages were inflicted upon plaintiffs.
 
 
 44
 The lower court's allusion to the complexity of evidence relating to plaintiffs' tax savings is not a viable reason for precluding such evidence in light of Norfolk & Western R. Co. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980). In the context of a wrongful death action under the Federal Employers' Liability Act (FELA),[26] the Court held that it was error to preclude evidence of the income tax payable on the decedent's past and estimated future earnings and to refuse to instruct the jury that the award of damages would not be subject to income taxation. While admitting that many variables affect the amount of a wage earner's future income tax liability, the Court observed that the calculation was no more uncertain or complex than that already made by juries in determining future earnings. The Court concluded, "We therefore reject the notion that the introduction of evidence describing a decedent's estimated after-tax earnings is too speculative or complex for a jury." Id. at 494, 100 S.Ct. at 758.
 
 
 45
 In the case before us, it is likely that the jury will not even be faced with the vagaries of calculating future income tax liability. Loftsgaarden's offer of proof indicated that he was prepared to show, based on an analysis of plaintiffs' income tax returns for the years 1973 to 1978, that three out of the four plaintiffs were net dollars ahead after foreclosure of the investment. All plaintiffs except Dr. Randall reported the proceeds from the foreclosure in their 1978 tax returns.[27] Thus, the net effect of the investment is subject to proof without the need for the jury to speculate about the impact of any future recoupment of the losses deducted. This is not to say that the present damage calculation is entirely devoid of speculation. Plaintiffs did indicate that their returns for the years 1973 to 1978 were undergoing audits by the Internal Revenue Service. Evidence of the audit and expert opinions as to its likely results are admissible at the retrial on damages. Certainly the possibility that past tax deductions will be disallowed is relevant to the determination of the extent of any benefit actually received by plaintiffs from those deductions. The jury is entitled to determine whether and to what extent there would be a disallowance of deductions.
 
 
 46
 We wish to clarify that the impact of our holding is not nearly so far-reaching as plaintiffs predict. They argue that because there are tax consequences to any investment one makes, evidence of those consequences will now figure in every securities fraud case. But our holding applies only to cases involving investments that are expressly marketed and sold as tax shelters. That is, investments which allow the investor
 
 
 47
 to offset certain "artificial losses" (that is, noneconomic losses but losses which are available as deductions under the present tax laws) not only against the income from those investments but also against the (investor's) other income, usually from his regular business or professional activity.
 
 
 48
 Staff of Joint Comm. on Internal Revenue Taxation, 94th Cong., 1st Sess., Overview of Tax Shelters 1 (Comm. Print 1975).
 
 
 49
 In conclusion we hold that in a private securities fraud action involving an investment structured and marketed as a tax shelter, where a rescissory measure of damages is applied, evidence of any benefit derived by the plaintiff/investor via tax savings must be permitted.
 
 V.
 
 50
 For the foregoing reasons, we vacate the award of damages and remand to the district court for a new trial on that issue.[28] In all other respects, the judgment of the district court is affirmed.
 
 
 
 *
 The Honorable William C. Hanson, United States Senior District Judge for the Northern and Southern Districts of Iowa, sitting by designation
 
 
 [1]
 Defendants Noah and Coult, officers and directors of the corporate general partner, Alotel, Inc., were found not liable
 
 
 [2]
 § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any national securities exchange-
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 Rule 10b-5 implementing § 10(b), 17 C.F.R. § 240.10b-5, provides:
 Employment of manipulative and deceptive devices.
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. Minn.Stat. § 80A.01 provides:
 It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:
 (a) to employ any device, scheme or artifice to defraud;
 (b) to make any untrue statement of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
 
 
 [3]
 § 12(2) of the Securities Act of 1933, 15 U.S.C. § 771(2) provides in pertinent part:
 Any person who-
 (2) offers or sells a security ..., by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
 
 
 [4]
 PDRC was the entity through which the real estate would be obtained and 2361 was to serve as the project's general contractor
 
 
 [5]
 The $2.31 million loan would initially be made by First National Bank of St. Paul, which would supply interim construction financing to the partnership. Once motel construction was completed, Larwin would buy the loan from the St. Paul bank pursuant to a "take-out" commitment and put in its place a first mortgage
 
 
 [6]
 One commentator offers the following example:
 A hypothetical real estate partnership might show a $50,000 loss in one year. Assume that this loss was obtained by taking the difference between $60,000 of deductible depreciation and $10,000 of gross rents in excess of operating expenses and interest. If mortgage amortization, a nondeductible expense, were $2,000, then the partnership would have a positive cash flow of $8,000. If under the partnership agreement, one limited partner were entitled to 50% of the partnership losses and 37.5% of the cash flow, that partner would receive $3,000 in cash, but his tax return would reflect only his share of the partnership's net loss, or $25,000.
 Note, Real Estate Limited Partnerships and Allocational Efficiency: The Incentive to Sue for Securities Fraud, 63 Va.L.Rev. 669, 673 n.22 (1977). See also T. Dahlk, Real Estate Partnerships and the Securities Laws: A Primer, 12 Creighton L.Rev. 781, 783 (1979); R. Hrusoff, Securities Aspects of Real Estate Partnerships, 11 Ca.W.L.Rev. 425, 458 (1975).
 
 
 [7]
 The land rental would be effected through a sale-leaseback arrangement whereby the partnership would acquire the land, sell it to a third party, and then lease it back from the third party purchaser. In reality, the transaction worked as follows: Part of the land was purchased by the partnership and then sold to Loftsgaarden's corporation, PDRC. In turn, PDRC purchased the remainder of the land outright, then sold the entire parcel to a third party, which leased the land back to PDRC. Then PDRC subleased the land back to the partnership
 
 
 [8]
 Plaintiffs each purchased one $35,000 unit except for Dr. Neumann who bought one and a half units for a total investment of $52,000
 
 
 [9]
 Loftsgaarden admits that Crawford made no representations "other than those in the Offering Memorandum." Brief for appellants at 16
 
 
 [10]
 At a nine and one-half percent interest rate
 
 
 [11]
 These findings and conclusions relate to the district court's ruling on plaintiffs' § 12(2) claim and are consistent with the special verdict returned by the jury upon the § 10(b), Rule 10b-5, Ch. 80A, and common law fraud claims. D.R. 266-74
 
 
 [12]
 At the time the offering memorandum was circulated, Minnesota law limited interest rates on loans to noncorporations to eight percent. Larwin finally agreed to make the loan through a corporate nominee, PDRC, which borrowed the money at nine and one-half percent from Larwin and then advanced it to the partnership at the legal rate of eight percent. PDRC recovered its loss on the transaction by adjusting the land rent it charged to the partnership. Supra note 7
 
 
 [13]
 The district court's findings indicate that the prime rate charged by the construction lender, First National Bank of St. Paul, rose from six percent in February 1973 to ten percent in February 1974. As has already been noted, the partnership was obliged to pay interest on this $2.31 million loan at a floating rate of four percent over the bank's prime lending rate
 
 
 [14]
 The jury found that neither these nor any subsequent advances were induced by any misrepresentations by Loftsgaarden and plaintiffs were not entitled to recover any of the amounts advanced
 
 
 [15]
 The parties agree that the elements of these various claims are identical
 
 
 [16]
 Reliance is not an element of an action under § 12(2). Alton Box Board Co. v. Goldman, Sachs & Co., 560 F.2d 916, 924 (8th Cir. 1977)
 
 
 [17]
 TSC Industries arose under § 14(a) of the Securities Exchange Act of 1934, but the test for materiality is the same under all of the securities statutes. See Alton Box Board Co. v. Goldman, Sachs & Co., supra at 919-20
 
 
 [18]
 The court instructed:
 In this case, the plaintiffs allege that the offering memorandum which was supplied to them by defendant Loftsgaarden contained representations which were false and misleading. They also alleged that defendant Loftsgaarden made oral representations to them at the time that they purchased their units in Alotel Associates, and at the time that further contributions to the partnership were solicited, which were false and misleading. As stated above, before the plaintiffs can prevail on these claims, they must first prove that such false and misleading representations were made. In addition, the plaintiffs must prove that they in fact relied upon these representations.
 The plaintiffs also claim that the offering memorandum was false and misleading in that it failed to disclose material facts. Where the claims asserted under Section 10(b) or Rule 10b-5 relate to nondisclosure as opposed to misrepresentations, then, if the nondisclosed facts are material, there is a presumption that the plaintiffs relied upon that disclosure. In that case, the plaintiffs need not prove that they would have acted differently had the facts been disclosed.
 T. 795-96.
 
 
 [19]
 Loftsgaarden argues that no "derivative reliance" theory (i.e., plaintiffs relied on experts who in turn relied on the offering memorandum) may be advanced because such a theory was neither pled nor raised at trial. See Keirnan v. Homeland, Inc., 611 F.2d 785, 789-90 (9th Cir. 1980). We reject this argument. The so-called derivative reliance theory was disallowed in Keirnan because plaintiff raised it for the first time on appeal, effectively denying defendants any opportunity for rebuttal. In addition, plaintiff failed to introduce any evidence that the third parties upon whom he purportedly relied did themselves rely on any misrepresentations. In the instant case, the third parties upon whom Neumann and Randall relied, Blaske and Essene, gave direct testimony and were subject to cross-examination on the reliance issue
 
 
 [20]
 Cf. Nye v. Blyth Eastman Dillon & Co., 588 F.2d 1189, 1197 n.14 (8th Cir. 1978) ("The appellants attempt to separate out each misrepresentation and show that each was insufficient to mislead the appellees. Such a position has little merit. Considered in the aggregate, we agree with the trial court that the misrepresentations did induce reliance on the part of the appellees.")
 
 
 [21]
 It is not apparent from the findings on the § 10(b) and Rule 10b-5 claims whether the jury found affirmative proof of reliance upon misrepresentations or presumed reliance based on material omissions or both. The issue, however, is clarified by the jury's alternative finding of liability based upon common law fraud. In this regard, the trial court instructed that plaintiffs had the burden of affirmatively proving reliance in order to recover
 Overall, the instructions and special verdict questions fully and correctly presented the reliance issue to the jury. We are, however, inclined to agree with the Third Circuit that a dual instruction on reliance is not the appropriate solution when confronted with a securities fraud case where both misrepresentations and omissions are present. We endorse that circuit's conclusion that "the proper approach to the problem of reliance is to analyze the plaintiff's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof of reliance." Sharp v. Coopers & Lybrand, 649 F.2d 175, 188 (3d Cir. 1981). Such an approach is consistent with this circuit's view that the presumption of reliance is limited to cases involving primarily omissions. Vervaecke v. Chiles, Heider & Co., 578 F.2d 713, 716-17 (8th Cir. 1978).
 
 
 [22]
 He further contends that the trial court erred in precluding introduction of evidence surrounding the progress of the project and the decisions which led to its ultimate foreclosure after Loftsgaarden resigned as general partner. We have examined the record and we hold that the evidentiary matters raised by Loftsgaarden had no bearing on the causation issue and were properly excluded for the reasons stated by the lower court at trial
 
 
 [23]
 The jury was told:
 It is the duty of the Court to admonish an attorney who, out of zeal for his cause, does something which is not in keeping with the rules of evidence or procedure. You are to draw no inference against the side to whom an admonition of the Court may have been addressed during the trial of the case.
 T. 782.
 
 
 [24]
 Where fraud is found to have affected the open market price of the security because others were influenced by the same misrepresentations made to the person seeking recovery, the measure applied is the difference between the purchase price and the actual value on the date of discovery of the fraud. Harris v. American Investment Co., 523 F.2d 220, 226 (8th Cir. 1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976)
 
 
 [25]
 Accordingly, there is no merit to Loftsgaarden's contention that the lower court erred in failing to submit to the jury the issue of when plaintiffs discovered the fraud. Loftsgaarden contends that jury determination of the question was "crucial to the issue of damages." Brief at 38. But in the context of damages, the time of discovery of the fraud is crucial only where the out-of-pocket measure is to be applied and the trier of fact is obliged to value the security as of this date
 
 
 [26]
 45 U.S.C. § 51 et seq
 
 
 [27]
 It is safe to assume that by this time, Dr. Randall has also reported the extent of his proportional share of the proceeds from the foreclosure. Even if he has not so reported, the extent of his share certainly is either known or discoverable
 
 
 [28]
 Accordingly, it is unnecessary for us now to address issues raised regarding the awards of prejudgment interest and attorneys' fees