**Gerald MELLMAN and Bernard Thorn, doing business as Mellman and Thorn Investments, on behalf of themselves, and on behalf of a class of persons similarly situated, Plaintiffs,**

v.

**SOUTHLAND RACING CORPORATION, a corporation, Defendant.**

No. J–C–80–220.

United States District Court,
E.D. Arkansas,
Jonesboro Division.

Nov. 10, 1983.

Harold J. Tomin, Los Angeles, Cal., Richard C. Downing, Little Rock, Ark., for plaintiffs.

Alston Jennings, Peter G. Kumpe, Wright, Lindsey & Jennings, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

WOODS, District Judge.

### FINDINGS OF FACT

1. The named plaintiffs, Bernard Thorn and Gerald Mellman, reside in Denver, Colorado and operate an investment partnership which owned 120 shares of Southland Racing Corporation (SRC) at the time of a reverse stock split in mid-1980. The investment partnership had acquired the SRC stock in the late 1950s or early 1960s.

2. The plaintiff class (excluding those opting out) as certified by the Court is comprised of at least 1,621 members.

3. SRC was incorporated in Arkansas on March 25, 1955. The primary business of SRC is the conducting of greyhound racing and pari-mutuel wagering on this sports event in West Memphis, Arkansas. SRC also owns and operates through a wholly-owned subsidiary, Southland-Ramada West, Inc., a Ramada Inn motel and restaurant adjoining the race track facility.

4. Southland Holding Corporation (SHC) was incorporated on September 16, 1974 in Arkansas and was created as a holding company primarily to engage in the ownership of shares of SRC.

5. Delaware North Companies, Inc. (DNC) is a Delaware corporation headquartered in Buffalo, New York. It is a holding company for the stock of numerous operating companies in the pari-mutuel, food service, sports publications and metal fabrication industries. DNC is owned by the Jacobs family of Buffalo, New York. At all times herein relevant, the Jacobs family of corporations was headed by a non-operating holding company, the last of which is DNC. During times relevant herein, the holding company prior to the last name change to DNC has been known successively as High Park Corporation, Emprise Corporation and Sportsystems, Inc. Approximately 90% of the outstanding capital stock of SHC is owned by DNC.

6. At all times herein material, SRC was a company obligated by the Securities and Exchange Act of 1934 (Exchange Act) to make reports to its shareholders and file reports with the Securities and Exchange Commission (SEC). (Stipulation of Facts)

7. SRC has used the instrumentalities of interstate commerce, including the United States Mail, to file reports with the SEC in Washington, D.C., and to disseminate information to its shareholders. (Stipulation of Facts)

8. SHC has used the instrumentalities of interstate commerce, including the United States Mail, to make tender offers for SRC stock in July, 1976 and December, 1977. (Stipulation of Facts; PX 62, 83)

9. In 1967–1968, DNC purchased the shares of SRC owned by the Masoni and Lombardo families. After these purchases, and at the end of 1968, DNC owned approximately 45% of SRC.

10. At the end of 1968, a group referred to by the parties as the Upton interests owned approximately 20% of SRC.

11. SRC's bylaws provided for cumulative voting. Thus, the Uptons owned sufficient SRC stock to elect at least one SRC director. Richard Upton was elected President of SRC in 1968.

12. In 1970 Richard Upton resigned as President of SRC, alleging that Jeremy Jacobs (Jacobs) wanted to use SRC's assets to benefit DNC and the Jacobs family. (PX 48, p. 1–2) Jacobs has been the Chairman of the Board and Chief Executive Officer of DNC since the death of his father, Louis Jacobs, in 1968. Jacobs was a director of SRC until 1969 when an Arkansas law was enacted which required all SRC directors to be residents of Crittenden County, Arkansas.

13. On May 5, 1970 SRC filed an application with the Arkansas Racing Commission for racing dates for 1970. That application was apparently denied by the Commission in part because of the indictment of DNC (Emprise Corporation at that time) in the United States District Court, Central District of California for mail fraud. The Pulaski County Circuit Court stayed the Commission order on May 8, 1970. (PX 154)

14. SRC's application for 1971 racing dates was also denied by the Commission. Thereafter, the Commission, on April 28, 1971 issued an interlocutory order granting SRC's application for 1971 racing dates pending a hearing as to whether SRC's franchise should be revoked. (PX 154)

15. The Commission revoked SRC's franchise on July 15, 1971. The Pulaski County Circuit Court on October 7, 1971 reversed the Commission's July 15, 1971 order. (PX 154)

16. The Commission on October 26, 1971 again revoked SRC's license. The Pulaski County Circuit Court again reversed the Commission on February 15, 1972. (PX 154)

17. Emprise was convicted of mail fraud in early 1972 and on May 12, 1972 the Arkansas Racing Commission ordered SRC to show cause why its franchise should not be revoked. Thereafter, the Commission, on July 24, 1972 issued an order revoking SRC's franchise 15 days after the conviction of Emprise Corporation became final. This order was appealed to the Pulaski County Circuit Court which reversed the Racing Commission. The reversal was affirmed by the Supreme Court of Arkansas. (PX 154)

Beginning at the annual meeting of stockholders of Southland Racing Corporation on June 17, 1972, Dr. Robert A. Leflar, distinguished professor of law, voted the shares of Southland Racing owned by Delaware North as voting trustee on behalf of the Arkansas Racing Commission. This trusteeship continued until terminated by the Arkansas Racing Commission on January 13, 1975. (PX 48 at pp. 000088–000093 and PX 128 at pp. 158–61)

18. In late 1972, Richard Upton presented to the Board of SRC a proposal that SRC purchase DNC's SRC stock at $18.00 per share. SRC's counsel, C.B. Nance outlined three alternative courses of action:

1. Reject the proposal as made;
2. Accept the proposal and call a special meeting of the stockholders to vote on it;
3. Subject to the willingness of DNC to sell its stock, file a lawsuit to determine the legality of the transaction. (PX 116)

19. In response to the proposal that DNC's stock be redeemed at $18.00 per share, Alston Jennings, attorney for DNC, wrote Upton's attorney inquiring as to whether or not the Uptons would be willing to sell their stock to DNC at the same price. (PX 116 at 5–0140) Upton turned down this offer.

20. During the pendency of the negotiations between Upton and SRC's board,

DNC offered to enter into a blind escrow transaction with the Uptons. Each party would state a price at which each would be indifferent to buying or selling. The party offering the highest price would acquire the other's stock. (PX 117)

21. Sometime prior to May 29, 1974 SRC agreed with the Uptons to redeem the Uptons' SRC stock for $25 per share. (DX 120) The Board met on May 30, 1974 and approved the redemption of the Upton shares. Dr. Leflar voted the DNC shares as Trustee on behalf of the Arkansas Racing Commission. He moved to approve the action of the directors in redeeming the Upton stock and he voted in favor of his own motion. (PX 48 at 0155–0162)

22. The purpose of the Upton redemption was to remove dissension and turmoil from SRC. DNC had a sufficient number of shares to elect a majority of the Board of Directors prior to this transaction. While unaffiliated minority shareholders, in effect, paid an aliquot portion of the purchase price, their proportionate ownership of SRC also was enhanced.

Plaintiffs' expert witnesses, Elizabeth Sears and Dr. Dennis Logue, testified that the prudent course of action for SRC during the 1970's was for SRC to purchase its own shares, thereby raising the value per outstanding share. Mrs. Sears specifically testified that the Upton redemption was a good buy for SRC.

23. The Upton redemption was approved by Dr. Robert Leflar, the voting trustee appointed by the Racing Commission who stated he would report the transaction to the Commission the same evening. (PX 48 at 0160–0161) In a letter to Alston Jennings dated January 3, 1975, Dr. Leflar stated:

> It is my belief, based upon considerable observation and investigation, that the track and connected activities are operated with honesty and integrity, without any evidence of improper conduct or exertion of corrupt influence of any kind. The operation appears to be wholly under the control of the local officers and directors, who appear to be good and honorable businessmen who know their work and perform it competently.

24. There is no evidence of a conspiratorial scheme to defraud the nonaffiliated shareholders by the manner in which the Upton redemption was completed.

25. Prior to the consummation of the redemption transaction, Jacobs proposed that SHC be formed, and that SHC be capitalized by a transfer of SRC stock owned by DNC and others for SHC stock. (PX 125)

26. In its Form 8K filings (pursuant to Section 15(d) of the Securities Exchange Act of 1934) for the months of January, 1975 (PX 42) and February, 1975 (PX 43 and 43A), SRC reported the November, 1974 transfer of a majority of SRC stock to SHC to the SEC. SRC made another disclosure of the exchange of shares to the SEC in its Form 10K for the year 1974. Neither the Form 10K nor the Form 8Ks violated Exchange Act § 18, 15 U.S.C. § 78r.

27. SRC stockholders were notified of the November, 1974 transfer of SRC stock to SHC by the Shareholders Information Statement for 1975 (PX 7) as well as by Schedule 13D statements (required by Section 14(d) of the Securities Exchange Act of the Tender Offer of 1934) accompanying the 1976 and 1977 Tender Offers (PX 62 and 83 respectively).

28. Plaintiff class received adequate and timely notice of the November, 1974 transfer of SRC stock to SHC. The various notices received substantially complied with the SEC requirements.

29. C.B. Nance at all times operated as independent counsel for SRC and was at all times fully advised of all of the details concerning Alston Jennings' representation of DNC and SHC and of his ownership of stock in both SHC and SRC. SRC at all times had the benefit of advice of fully-informed independent counsel. Ownership by Alston Jennings of stock of the corporation he represented did not in and of itself result in a conflict of interest. Neither the law firm of Wright, Lindsey & Jennings

nor Alston Jennings had a conflict of interest in their representations of SRC, SHC and DNC.

30. While the 1976 and 1977 tender offers were made by Southland Holding Corporation, which is not a party to this lawsuit, the Court will make specific findings, *infra,* concerning these tender offers.

31. SHC made a tender offer for SRC stock in July, 1976 wherein it disclosed the overlap of management of SHC and SRC; the possibility that SRC might become a wholly-owned subsidiary of SHC; that a merger between SRC and SHC might occur; that SRC might be included in DNC's consolidated tax return; and that SRC might "go private" subsequent to the tender offer, along with various other disclosures. (PX 62)

32. No conspiracy or plan existed to squeeze out unaffiliated shareholders.

33. The tender offer statements disclosed that the collateral for the loans was SHC's shares of SRC and that SRC might increase the dividends on said shares to retire the indebtedness. However, there is no evidence that SRC funds were used to pay the loans for the purchases of the SRC stock by SHC. Harry Latourette, currently President of SRC, testified that SRC considered the loans free of risk and advantageous to SRC.

34. Failure of SRC to notify nonaffiliated stock holders of the 1976 offer to purchase a dog track located in Hollywood, Florida did not materially affect the SRC price contained in the 1976 and 1977 tender offers.

35. The 1976 and 1977 tender offer statement sufficiently informed plaintiff class that SRC may be included in a consolidated tax return with DNC. SHC did not withhold material information concerning this possible consolidation of tax returns.

36. DNC, SHC and SRC "insiders" were not "market makers" in SRC stock. Their transactions in SRC stock were not 10b–5 violations. The market for SRC stock had been limited and the tender offers disclosed that the quoted prices did not necessarily represent actual transactions.

37. In 1979 Aubrey Spear, an SRC board member, suggested to Harry Latourette that a reverse stock split might be a possibility for SRC. No prior discussions had been held or plans made by SRC management concerning such a reverse stock split. The reverse stock split was not part of a fraudulent scheme to "squeeze out" plaintiff class members.

38. On March 21, 1980 at a meeting of the shareholders an amendment to the Articles of Incorporation of SRC was approved and a reorganization was authorized for a reverse stock split of Southland Racing Corporation stock whereby one share of newly issued $125.00 par value stock would be exchanged for 250 shares of currently issued $.50 par value common stock. Fractional shares would not be issued.

39. Stockholders left with fractional shares by this transaction were given the options of either allowing SRC to purchase their shares, allowing SRC to cancel their shares, or purchasing a sufficient number of $.50 par value common stock to constitute one new share of $125.00 par value stock.

40. Both the benefits and the detriments of the reverse stock split were fully disclosed in the Shareholders' Information Statement dated March 21, 1980.

41. The conflict of interest between the directors and officers of SRC and the minority shareholders of SRC was disclosed in the Shareholders' Information Statement dated March 21, 1980.

42. Management Analysis Center, Inc. (MAC) was retained to assist SRC in its stock valuation project made in conjunction with the 1980 reverse stock split. MAC is a management consulting organization headquartered in Cambridge, Massachusetts. MAC arrived at a price of $44.52 paid to the class members upon the implementation of the reverse stock split transaction in March, 1980. This was a fair price for the SRC stock at that time.

43. The valuation method and the assumptions made by MAC were fully disclosed to the shareholders in the Shareholders' Information Statement dated March 21, 1980.

44. The valuation method utilized by MAC was in accordance with generally accepted valuation practices.

45. The assumptions made by MAC in its valuation were reasonable.

46. The Shareholders' Information Statement disclosed that Southland Racing had selected MAC through reference from DNC and that DNC had utilized MAC on previous occasions and anticipated utilizing MAC in the future. (PX 136)

47. The Shareholders' Information Statement made no misrepresentations or omissions of fact that would have affected the decision-making process of a reasonable shareholder in response to the reverse stock split.

48. Some of the so-called "insiders" of SRC sold SRC stock on June 15, 1979 (Bolinger) and July 31, 1979 (Susan and Van Spear) at a price less than the 1980 MAC price. Had a scheme to defraud existed as alleged by plaintiff, it is difficult to believe that the corporate "insiders" would have made these sales. Furthermore, at the time of the Upton Redemption, SRC's board of directors declined to take advantage of the opportunity to purchase additional SRC shares at $25 per share. (PX 48, 189) This conduct is entirely inconsistent with a scheme to defraud plaintiff class.

49. There is no evidence of illegal manipulation of the market price of SRC stock.

50. The March, 1980 Information Statement was not materially deceptive. The Shareholder Information Statement for the 1975 annual meeting (PX 7) had previously disclosed that SHC had been formed; that DNC was the principal shareholder of SHC; and that DNC, along with other SRC shareholders, had exchanged their SRC stock for SHC stock. Also, both tender offer statements disclosed the extent to which the officers and directors of SRC and SHC were identical as well as their stock ownership in the two corporations. (PX 62 at pp. 4, 7, 9 and PX 83 at pp. 6, 9–12) The extent to which the officers and directors of SRC, SHC and DNC were identical was disclosed in the March, 1980 Shareholder Information Statement. (PX 136 at pp. 22–27)

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78a on the claim for violation of the Exchange Act, and SEC Rules 10b–5 and 13e–3. This court has jurisdiction of the parties and venue is proper.

■ 2. SRC along with SHC, DNC and other individuals have not engaged in a conspiracy to defraud its non-affiliated minority shareholders by acquiring their equity interest in SRC for less than fair value.

■ 3. SRC has not violated § 10(b) of the Securities and Exchange Act of 1934, and SEC Rule 10b–5. There has been no misstatement or omission of any material fact by SRC (or by persons chargeable to SRC) with the requisite scienter upon which plaintiffs have relied proximately resulting in any damages.

■ 4. Assuming that there is a private right of action for damages for violation of SEC Rule 13e–3 (which has been promulgated by the SEC pursuant to Exchange Act §§ 13(e) and 14(e), SRC has not violated Rule 13e–3.

■ 5. A material fact is one that a reasonable shareholder would consider important in deciding on a course of action. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *St. Louis Union Trust Co. v. Merrill Lynch, etc.*, 562 F.2d 1040, 1048 (8th Cir.1977); *Austin v. Loftsgaarden*, 675 F.2d 168, 176 (8th Cir.1982).

■ 6. The Shareholders' Information Statement dated March 21, 1980 fully disclosed the material facts with respect to the reverse stock split. The defendant had

no intent to deceive, manipulate, or defraud the plaintiffs and plaintiff class. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). This "going-private" transaction benefited SRC and was a legitimate corporate procedure. *See, e.g. Polin v. Conductron Corp.* 552 F.2d 797 (8th Cir.1977).

8. Plaintiffs have failed to prove by a preponderance of the evidence that the defendant made any misrepresentation or omission of material fact with reckless disregard for its truth.

9. Defendant is entitled to entry of judgment in its behalf dismissing plaintiffs' class action complaint.