807 F.2d 359
 Fed. Sec. L. Rep. P 92,987, 21 Fed. R. Evid. Serv. 1283
Silvia L. ADALMAN; George S. Allen; Bernard Ansher; Irene
B. Ansher; Laurence Banyas; J. Frank Belford, Jr.; Grace
C. Belford; Juan M. Cameron; Nora L. Cameron; Dale Ann
Cooke; Dennis D. Donahue; Gretchen J. Donahue; Stanley H.
Engle; Marilyn J. Engle; Harry Feinberg; Douglas S.
Goodwin; John F. Griffin; Ridgway M. Hall, Jr.; Anne
Harken Hall; Donald V. Kane; Lois Jean Kane; Samuel J.
Floyd, Jr.; Malcolm R. Lovell, Jr.; Celia C. Lovell;
Warren L. Miller; O/G Recovery Partners, a Maryland
Partnership; Richard A. Slifer; Kristine R. Slifer;
Gifford Weary and Robert K. Weary, Jr., Appellees,
and
Gerald J. Bowes and Luther C. Dilatush, Plaintiffs,
v.
BAKER, WATTS & CO., a Maryland Partnership, Appellant.
Edgar M. BOYD; N. Clark Moran; Paul Berghaus; B-W
Resources, Inc., a Maryland Corporation and Scott
W. Williams, Defendants,
v.
JULIA M. WALSH & SONS, INC.; Henry T. Donaldson; Thomas D.
Walsh; Douglas R. Bevers and Elkins & Co., a
Division of Prudential Bache Securities,
Inc., Third-Party Defendants.
Silvia L. ADALMAN; George S. Allen; Bernard Ansher; Irene
B. Ansher; Laurence Banyas; J. Frank Belford, Jr.; Grace
C. Belford; Juan M. Cameron; Nora L. Cameron; Dale Ann
Cooke; Dennis D. Donahue; Gretchen J. Donahue; Stanley H.
Engle; Marilyn J. Engle; Harry Feinberg; Douglas S.
Goodwin; John F. Griffin; Ridgway M. Hall, Jr.; Anne
Harken Hall; Donald V. Kane; Lois Jean Kane; Samuel J.
Floyd, Jr.; Malcolm R. Lovell, Jr.; Celia C. Lovell;
Warren L. Miller; O/G Recovery Partners, a Maryland
Partnership; Richard A. Slifer; Kristine R. Slifer;
Gifford Weary and Robert K. Weary, Jr., Plaintiffs,
and
Gerald J. Bowes and Luther C. Dilatush, Appellants,
v.
BAKER, WATTS & CO., a Maryland Partnership, Appellee.
Edgar M. BOYD; N. Clark Moran; Paul Berghaus; B-W
Resources, Inc., a Maryland Corporation and Scott
W. Williams, Defendants,
v.
JULIA M. WALSH & SONS, INC.; Henry T. Donaldson; Thomas D.
Walsh; Douglas R. Bevers and Elkins & Co., a
Division of Prudential Bache Securities,
Inc., Third-Party Defendants.
 Nos. 85-1964(L), 85-1965.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 3, 1986.
Decided Oct. 31, 1986.
 
 1
 John Henry Lewin, Jr. (Thomas F. O'Neil, III, Geoffrey R. Garinther, Venable, Baetjer & Howard, Baltimore, Md., David S. Cupps, Joseph D. Lonardo, Vorys, Sater, Seymour & Pease, Columbus, Ohio on brief), for Baker, Watts & Co.
 
 
 2
 Gerson B. Mehlman (Wilbur D. Preston, Jr., John M. Belferman, Whiteford, Taylor & Preston, Baltimore, Md., on brief), for Gerald J. Bowes and Luther C. Dilatush.
 
 
 3
 David Machanic (John A. Ritchie, Joan L. Loizeaux, Pierson, Ball & Dowd, Washington, D.C., on brief), for Appellees.
 
 
 4
 Before HALL and SPROUSE, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.
 
 
 5
 MICHAEL, District Judge.
 
 
 6
 This case presents for resolution several issues which have arisen out of the use of the so-called "tax shelter".
 
 I. FACTS
 
 7
 The controversies evolved from the relationships between Baker, Watts & Company, a Maryland investment banking partnership (hereinafter Baker, Watts), and Superior Petroleum, Inc. (hereinafter Superior), a closely-held Ohio corporation engaged in drilling for gas and oil in Ohio. In early 1981, certain partners, employees and counsel for Baker, Watts bought one-third of the outstanding stock of Superior, and two of the Baker, Watts personnel became members of the five-member board of directors of Superior. At that time, Baker, Watts was also the largest contributor of funds to finance Superior's drilling activities.
 
 
 8
 Subsequently, in the spring of 1981, Baker, Watts undertook to serve as the dealer-manager for a private offering of limited partnership interests in a tax shelter investment which was denominated "Superior Drilling Partners No. 81" (hereinafter the Partnership), in which Superior was a general partner. Under the agreement, Baker, Watts would offer and sell in interstate commerce, on a best-efforts basis, limited partnership interests in the partnership. In its capacity as a dealer-manager, Baker, Watts entered into soliciting dealer agreements with two securities dealers, Julia M. Walsh & Sons (hereinafter Walsh) and Elkins & Co. (hereinafter Elkins), in which both agreed to use their "best efforts" to find investors to purchase the limited partnership interests.
 
 
 9
 In preparation for the selling effort, Baker, Watts prepared a lengthy Confidential Offering Memorandum, which served essentially as a prospectus for the offering. The document was furnished to all investors, either directly from Baker, Watts, or through the soliciting dealers. Baker, Watts stringently required Walsh and Elkins to use only the Offering Memorandum in soliciting investors. Walsh and Elkins were directed to make no representations of any sort concerning the offering other than those representations contained in the Offering Memorandum. The Memorandum contained a number of references to Baker, Watts as an "affiliate" of the general partner, Superior. The Memorandum provided that each limited partnership interest would be sold for $75,000, half to be paid in cash, and the other half in the form of promissory notes secured by letters of credit. This permitted the investors to defer payment of half the purchase price while realizing immediately income tax deductions permitted for this type of investment.
 
 
 10
 Thirty-one investors purchased interests worth a total of $1,702,500 during the course of the private offering, which opened on March 9, 1981, and closed on June 1, 1981. Nineteen of these investors purchased their interests through the soliciting dealers, Walsh and Elkins, and ten investors purchased their interests through Baker, Watts. Unfortunately for the rosy expectations of the parties, Superior ran into financial difficulties in the spring of 1982, and these problems were magnified by the untimely death of Superior's president in June of 1982. These events brought the Partnership into receivership in June of 1982, and the Clinton Oil Company took over operation of the Partnership, though it ultimately proved to be unprofitable. The letters of credit of the various investors were called in December 1982, thus effectively terminating the Partnership and resolving the matter of payment for the interests which had been purchased by the investors.
 
 
 11
 In April of 1983, the investors as a group filed suit against Baker, Watts and several others, alleging violations of numerous state and federal securities laws, and seeking rescission of the original investment contracts and restitution. All counts were eventually dismissed by stipulation, except those counts which charged violations of Sec. 12(2) of the Securities Act of 1933, 15 U.S.C. Sec. 77l(2), and Maryland Corporations and Associations Code Sec. 11-703(a)(1)(ii). The core of these remaining counts focused on the allegation that those persons listed in the Offering Memorandum as being "associated" with Baker, Watts negotiated with, and eventually sold their stock in Superior, to Anthony Biondi, Superior's president, such negotiation being carried on during the offering period, with the sale to Biondi occurring shortly after the close of the offering period. This information was never disclosed to any of the individual investors or to the soliciting dealers at any time before the offering was closed. In fact, an employee at Baker, Watts who was responsible for the Partnership's gas and oil investments and who handled negotiations for the sellers of Superior stock, Hugh Grady, stated at trial that he had not revealed the negotiations between the "affiliates" and Superior because he felt that disclosure of this information would have an adverse, and likely fatal, effect on the offering.
 
 II. ISSUES PRESENTED
 
 12
 The issues presented for resolution on appeal are as follows:1. Did the District Court err in instructing the jury that Baker, Watts was a "seller" as to all plaintiffs within the meaning of Sec. 12(2) of the Securities Act of 1933?
 
 
 13
 2. Did the District Court err in refusing Baker, Watts permission to call an expert witness to testify concerning the Superior stock sale, under the circumstances of this case?
 
 
 14
 3. Did the District Court err in its determination of the plaintiff's damages by disregarding the tax benefits received by the plaintiffs as a result of their investment in the limited partnership?
 
 
 15
 4. Did the District Court err in its rulings and in its instructions to the jury on the issue of causation?
 
 
 16
 5. Did the District Court err in directing a verdict against two plaintiffs, Bowes and Dilatush?
 
 III. DISCUSSION
 
 17
 A. The District Court's instruction that Baker, Watts was a "seller" within the meaning of Sec. 12(2)
 
 
 18
 The court below found as a matter of law that Baker, Watts was a seller within the meaning of Sec. 12(2) "with respect to all of the plaintiffs in this case, whether they purchased from Baker, Watts or through other broker/dealers." Section 12(2) of the Securities Act of 1933 reads in pertinent part as follows:
 
 
 19
 Any person who ... offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statement, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
 
 
 20
 15 U.S.C. Sec. 77l(2) (emphasis added). In applying this section to the present case, it is obvious that a determination of who "sells a security" requires a determination of whether an entity is a "seller" of securities under the Act. The circuit courts, however, have diverged in their attempts to define who is and is not a "seller" under the Act.
 
 
 21
 Much of the courts' inquiries into this matter have focused on the concept of "privity of contract". Two circuits have required that liability under Sec. 12(2) as a "seller" must be premised upon strict privity between the buyer and seller, so that a plaintiff may sue only his immediate seller. See, Sanders v. John Nuveen & Co., Inc., 619 F.2d 1222, 1226 (7th Cir.1980); Collins v. Cignetics Corp., 605 F.2d 110, 113 (3rd Cir.1979). However, this Circuit has taken a broader view of the statute, and has allowed a plaintiff to sue a defendant under Sec. 12(2) where that defendant is a "significant participant" in, or one who "proximately caused", a sale of securities. See, e.g., Admiralty Fund v. Jones, 677 F.2d 1289, 1294 (9th Cir.1982). In Lawler v. Gilliam, 569 F.2d 1283, 1287-88 (4th Cir.1978), we fully considered this issue, and held that the status of the entity as a "seller" of securities should be determined by whether the entity was a "substantial factor" in the sale of the securities.
 
 
 22
 In most of the decisions on this issue, suit was commenced against the broker-dealers. Here, however, plaintiffs seek to establish that Baker, Watts, the dealer-manager of the Partnership, was a "seller" of the securities. We pause to note that although the "substantial factor" test has been applied almost exclusively to broker-dealers, nothing in law or logic indicates that this test should not likewise be applied to a dealer-manager in the position of Baker, Watts.
 
 
 23
 Baker, Watts sought to resolve this issue in its favor in a pre-trial motion for summary judgment. 599 F.Supp. 749. The court below denied that motion, stating that:
 
 
 24
 Baker, Watts was the exclusive agent for the purpose of finding investment subscribers, and organized the entire offering; it had total responsibility for selecting other soliciting dealers who were authorized to offer and sell the unit under a fee-sharing management with it. Baker, Watts alleges that those plaintiffs who purchased through other dealers were induced to buy, not by its actions, but by statements and negotiations made by the soliciting dealers. Whether its activities were a "substantial factor" in causing plaintiffs to purchase through dealers such as Walsh is a question of fact which remains in dispute. The extent of its involvement in those negotiations must await resolution by the trier of fact.
 
 
 25
 In Lawler, applying a "substantial factor" test, we found that the definition of "seller" only excludes those persons "who execute an unsolicited order or whose minor role in the transaction shows they have no causal connection with it ..." 569 F.2d at 1287. We perceive no legal reason why the "substantial factor" test should not likewise be used in determining a dealer-manager's status as a "seller", and we hold that such a "substantial factor" test is appropriately applied to determine a dealer-manager's status as a "seller". The record below thoroughly documented the activities of Baker, Watts' participation in and management and direction of the sale of these securities. Baker, Watts did not perform merely mechanical actions of an underwriter or broker. First, Baker, Watts, was clearly an affiliate of the issuer, and it put the entire limited partnership offering together. In addition, of considerable importance under the "substantial factor" test, Baker, Watts ensured that it alone would control any and all information communicated to potential investors through its strict requirement that the broker-dealers use only the Offering Memorandum prepared by Baker, Watts in soliciting investors.
 
 
 26
 As shown in the pertinent part of the Soliciting Dealer Agreement between Baker, Watts and Walsh, dated 9 March 1981 Baker, Watts required of Walsh adherence to the following strictures in selling the interests:
 
 
 27
 1. Solicitation Material. In soliciting subscriptions for the Units you are authorized to use only the Confidential Memorandum furnished to you by the Dealer Manager, and you agree not to publish, circulate or otherwise use any other solicitation material or advertisement without the prior written approval of the Dealer Manager. Neither you nor any other person shall make any representations or furnish any information in connection with the offering or sale of the Units other than those contained in the Confidential Memorandum.
 
 
 28
 Furthermore, Baker, Watts determined the terms and conditions of the sales, acted as the administrator and holder of the letters of credit, and was paid a consulting fee for these services. In the face of these facets of Baker, Watts' participation in and management and control of the selling arrangements, we cannot accept Baker, Watts' contention that it had no significant role in soliciting the various sales implemented through the dealers.
 
 
 29
 Significantly, no evidence was ever offered below to contradict the evidence of Baker, Watts' involvement in the sales save for some self-serving, conclusory statements made by certain Baker, Watts personnel. Because no contradictory evidence of any weight existed, the court below found as a matter of law that Baker, Watts met the "substantial factor" test. The court instructed the jury after the close of evidence that "Section 12(2) applies to any person who offers or sells a security. I instruct you that Baker, Watts is a seller with respect to all of the plaintiffs in this case whether they purchased from Baker, Watts or through other broker/dealers." While this charge represented a change from the court's ruling on Baker, Watts' motion for summary judgment, it was obviously based upon a complete review of all the evidence at the close of the trial.
 
 
 30
 We thus find that, based upon the affirmative evidence before the court concerning Baker, Watts' role in the arrangement of the Partnership, and the sale of limited partnership interests, and the lack of any meaningful contravening evidence, the court below did not err in applying the "substantial factor" test, or in finding that Baker, Watts was in fact a "seller" within the meaning of Sec. 12(2).
 
 
 31
 B. The District Court's refusal to allow a Baker, Watts expert witness to testify
 
 
 32
 In considering this assignment of error, we begin by stating the issue as it is stated in the briefs. The appellant states this issue as follows:
 
 
 33
 Did the district court err in refusing to permit Baker, Watts & Co., to call an expert witness after ruling, sua sponte, that another witness, who had been identified in the pretrial Order, could not testify as an expert?
 
 The appellee states this issue as follows:
 
 34
 The District Court Did Not Err In Refusing To Permit Baker, Watts To Call An Expert Witness Under the Circumstances That Occurred At Trial.
 
 
 35
 The slightly varying statements of this issue thus deal implicitly with the discretion of the court below to refuse the offer of an expert witness, and in fact much of the briefs of the parties deals with the issue of discretion, the timing of the proffer of the excluded expert, and similar matters bearing on the exercise of discretion. Consideration of the record, however, reveals a deeper question which must engage the attention of this court, as well as the issue of proper use of trial court discretion. This deeper question was not dealt with in the briefs or in oral argument of the case before this court.
 
 
 36
 From the discussion, supra, it is obvious that the omission from the Confidential Memorandum of the information about the negotiations for sale by Baker, Watts personnel of their stock to Biondi was a crucial factor, if not the crucial factor, in the plaintiffs' case. Flowing from that was the question whether the omitted information was "material" to the investment decision, as that question is discussed infra.
 
 
 37
 In the effort to defeat the plaintiffs' case, Baker, Watts tendered Mr. Timothy Casgar as an expert witness to testify as to his conclusion that the applicable law did not require the disclosure of the omitted information. From the record, it is apparent that Baker, Watts intended to call Professor James Cheek and Mr. Casgar, the latter of whom had been legal counsel to Baker, Watts and to the partnership, to testify, as expert witnesses, that there existed no legal requirement that the negotiations between Baker, Watts personnel and the president, Mr. Biondi, of Superior be disclosed.
 
 
 38
 The analysis is somewhat diverted from what we consider to be the deeper question by the ruling of the court below that it would not permit Casgar to testify as an expert witness because Casgar was "an individual who is involved in the litigation." This statement was made by the court to counsel during the first trial below, which ended in a mistrial. The trial court further indicated that Baker, Watts could obtain an independent expert witness who could be deposed by plaintiffs following the mistrial and before the retrial began.
 
 
 39
 As it developed, Dr. Cheek, described as an "attorney[s] with experience with disclosure documents under the securities laws," was not able to be present to testify at either the trial or the retrial. Casgar remained as the only expert witness as to the disclosure requirements of the securities laws listed by Baker, Watts, as included in the Pre-Trial Order.
 
 
 40
 Thus is presented the deeper issue raised in the record in this case, though stated only by inference in the Statement of the Issue by the parties, and, as noted, not dealt with in the briefs and arguments of the parties. That is, to what extent may the parties call expert witnesses, lawyers in this case, to testify to the jury as to what the applicable law may mean, and what the applicable law does or does not require?
 
 
 41
 While this case turns on the applicability and meaning of the securities laws, the issue as just stated obviously has a far broader reach than securities cases. If such experts are to testify to the meaning and applicability of securities laws, what line is to be drawn to exclude tort lawyers from offering their expert opinions to the jury as to the meaning and applicability of the laws governing tort litigation? Examples of this sort could be multiplied across the gamut of litigation.
 
 
 42
 The analysis here begins with the proposition that under our system it is the responsibility--and the duty--of the court to state to the jury the meaning and applicability of the appropriate law, leaving to the jury the task of determining the facts which may or may not bring the challenged conduct within the scope of the court's instruction as to the law.
 
 
 43
 Under circumstances involving domestic law, this court can conceive of no circumstances which would shift this burden from the court to the jury, where the jury judgment would be influenced, if not made, on the basis of expert witness testimony which would undoubtedly follow the usual pattern of conflicting expert opinions. Permitting such testimony as to legal conclusions gives cogent meaning to the "apprehensions that jurors will turn to the expert, rather than to the judge, for guidance on the applicable law." 3 Weinstein and Berger, Weinstein's Evidence, 704-14 (1985).
 
 
 44
 There are cases, particularly those involving foreign law, where the court may receive and consider the opinions of experts in that foreign law, usually practitioners in that law, as to the meaning and applicability of that law to a controversy pending in one of our courts. There, however, the significant difference is that such expert witness evidence is presented to the court--not to the jury--to aid the court in formulating its charge in the relatively rare such cases in which a jury is involved. No factors favoring such use of experts, e.g., problems of translation, or understanding of the requirements of a different legal system, are presented in this case.
 
 
 45
 The proffer of expert opinion in many cases raises problems difficult of resolution by the trial court, where the line must be drawn between proper expert evidence as to facts, the inferences to be drawn from those facts, and the opinions of the expert, on the one hand, and testimony as to the meaning and applicability of the appropriate law, on the other hand. While sometimes difficult to discern that line, especially in the heat of trial, it nonetheless must be drawn.
 
 
 46
 In this case itself it appears that Mr. Casgar's testimony on cross-examination on matters other than the omission of the stock sale negotiations may well have verged on transgression into Casgar's offering to the jury his opinion as to the governing law. Casgar testified that "What an investor relies on is going to be up to him--I'm not sure what that is. Legally the offering is made through the offering memorandum." (emphasis added). While this involves a relatively minor point, it emphasizes the difficulty of drawing the appropriate line. This answer was, however, in cross-examination, and no effort to strike or modify the answer was made.
 
 
 47
 Perhaps the case most nearly on point to this case is Marx & Co., Inc. v. Diner's Club, Inc., 550 F.2d 505 (2nd Cir.1977) cert. denied 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), which involved something of the same fact pattern as in the case before us, in that Marx involved securities law, though in a case brought under Sec. 10(b) of the Securities Exchange Act of 1934.
 
 
 48
 In Marx, a plaintiff's witness was qualified as an expert in securities law. The issues there related to the construction of a contract between the parties and the validity of certain defenses advanced by Diner's justifying its performance under the contract. The expert, one Friedman, was permitted to testify fully on both these issues, over the vigorous objection of counsel for the defendant, based principally on the argument that certain of the opinions of Friedman stated "a legal conclusion."
 
 
 49
 The record in Marx is somewhat more instructive than the record in this case since Friedman was permitted to testify fully as an expert, stating legal conclusions, evidencing clearly the vice of opening this gate to the admission of testimony of experts as to legal conclusions.
 
 
 50
 In Marx, the court cogently delineates permissible and impermissible areas for testimony from the securities laws expert, saying:
 
 
 51
 We hold that the District Court erred in permitting Friedman, an expert witness called by plaintiffs, to give his opinion as to the legal obligations of the parties under the contract.... Friedman was qualified as an expert in securities regulation, and therefore was competent to explain to the jury the step-by-step practices ordinarily followed by lawyers and corporations in shepherding a registration statement through the SEC....
 
 
 52
 Mr. Friedman gave expert testimony that six to eight weeks was all that should have been necessary to effectuate a registration statement because 'much of the work going into it had already been done' in the preparation of a proxy solicitation filed by the surviving corporation in a merger. This testimony concerned the practices of lawyers and others engaged in the securities business. Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry. (citations omitted).
 
 
 53
 In the case at bar, however, witness Friedman's objectionable testimony did not concern only the customary practices of a trade or business. Rather, he gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed Diners' conduct. He testified not so much as to common practice as to what was necessary 'to fulfill the covenant' [of the contract]....
 
 
 54
 See Marx, supra at pps. 508, 509 (emphasis in original).
 
 
 55
 Perhaps the most trenchant statement on this point is also drawn from Marx, where the court states,
 
 
 56
 The basis of expert capacity, according to Wigmore (Sec. 555) may 'be summed up in the term "experience" '. But experience is hardly a qualification for construing a document for its legal effect when there is a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law....
 
 
 57
 In this case, Mr. Casgar was listed as a proposed expert witness in the Pre-Trial Order as "an attorney with experience with disclosure documents under the securities laws." So far as this description goes, Casgar might well have been qualified to testify as an expert under the guidelines set out above, absent any other disqualifying factor, dealing with "the step-by-step practices ordinarily followed by lawyers and corporations" in activities regulated by the securities laws. However, the record reveals clearly what the defendants sought to elicit from Casgar. Well before Casgar was proffered as an expert witness, the following colloquy between defendants' counsel and the court took place:
 
 
 58
 MR. CUPPS: What I'm saying is I did not want to be met with an objection to adducing ... opinion evidence from him on the ground that I haven't disclosed that he would express such statements in the pre-trial order.
 
 
 59
 ....
 
 
 60
 He is not a retained expert. He will express his opinion, of course.
 
 
 61
 THE COURT: No, he will not.MR. CUPPS: As a lawyer, Judge.
 
 
 62
 Joint App., p. 468.
 
 
 63
 Casgar was called and testified at length as a fact witness concerning the entities forming a limited partnership, the functions of a dealer-manager, etc., but began explaining legal terms, specifically the difference between a contract and an option, when the examination along these lines was ended by the court, saying:
 
 
 64
 ... I will allow him to testify factually at what was done and why it was done but I will not allow him to give any opinion that it wasn't legally required or wasn't material or whatever else it may be....
 
 
 65
 Joint App., p. 685.
 
 
 66
 The efforts to have Casgar testify at trial as to legal requirements, rebuffed by the court, by no means ended the matter. In the Appellant's Reply Brief, at page 11, dealing with the exclusion of that portion of Casgar's testimony, it is stated:
 
 
 67
 Expert opinion would have been helpful to the jury because, in the absence of something more tangible than Biondi's vague overtures about acquiring stock, securities practice and legal requirements may not have called for disclosure of these inchoate transactions.
 
 
 68
 (emphasis added).
 
 
 69
 The Reply Brief cites two cases, Greenfield v. Heublein, Inc., 742 F.2d 751 (1984), cert. denied, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985) and TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), for the proposition that some information may not be of such nature as to require disclosure, but these cases are inapposite to the issue here, as to whether Casgar may testify to legal conclusions.
 
 
 70
 From beginning to end, it is obvious that Appellants proffered Casgar as an expert witness to testify in substantial part to the meaning and applicability of the securities laws to the transactions here, giving his expert opinion on the governing law. This flies squarely in the face of the precedent--and the logic of that precedent--set out in Marx, supra.
 
 
 71
 Thus, the court sustains the action of the court below in excluding the testimony of Casgar as an expert, though as indicated the court's reasoning on this point differs in some degree from the reasoning of the trial court in excluding that testimony.
 
 
 72
 Application of revised Rule 704(a) of Fed.R.Evid. does not change this conclusion. That rule provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." (emphasis added).
 
 As the annotation to Rule 704(a) notes:
 
 73
 The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day....
 
 
 74
 In earlier days, the proscription of testimony on the "ultimate issue" was, in the commoner fact patterns, based on the conclusion that such testimony "usurped the province of the jury." Rule 704(a) removes that proscription, but it should not, and does not, permit the expert witness to usurp the province of the judge.
 
 
 75
 We conclude that such evidence as that proposed to be adduced from Casgar as an expert is not admissible, and thus falls within the bar imposed by the "otherwise admissible" language of Rule 704(a). See Marx, supra, at 512, where the court stated,
 
 
 76
 [r]ecognizing that an expert may testify to an ultimate fact, and to the practices and usages of a trade, we think care must be taken lest, in the field of securities law, he be allowed to usurp the function of the judge....
 
 
 77
 Turning now to the other issues raised in connection with the refusal to allow Baker, Watts to call an expert, the court below notified counsel for Baker, Watts during the first trial, which, as noted, ended in a mistrial, that it would not permit Casgar, "an individual who is involved in the litigation", to testify as an expert witness. At that time, the court also indicated that Baker, Watts could obtain an independent expert witness and allow him to be deposed by the plaintiffs following the mistrial, and before the retrial.
 
 
 78
 On retrial, the court below maintained its position, and would not accept Casgar as an expert witness, though he was allowed to testify at length as a fact witness concerning the negotiations and why they took place. For the reasons indicated above, the exclusion of expert testimony from Casgar as to legal conclusions is affirmed here.
 
 
 79
 At the time of the second trial, which began on 6 May 1985, Baker, Watts did not immediately tender an independent expert. Rather, Baker, Watts produced that independent expert on 15 May 1985, just at the conclusion of trial testimony, and had identified that independent expert to plaintiff's counsel on 13 May 1985. However, the court refused to permit the independent expert to testify, both because he had not been listed in any of the pre-trial orders, and, more importantly, had not been identified to plaintiff's counsel until 13 May 1985. The court below further indicated that had this last expert witness been made available to the plaintiffs for deposition shortly after the 29 April 1985 ruling regarding Casgar, the court would have allowed the witness to testify. The record does not reveal any reason for Baker, Watts' failure to identify the independent expert between 29 April 1985 and 13 May 1985.
 
 
 80
 A trial court's discretion to exclude evidence on the ground that it is outside the scope of its pre-trial order is broad, and in this case, the failure to identify to the plaintiff's counsel the independent expert until 13 May 1985 is a significant factor upon which the trial court's discretion is to be exercised. Generally, such rulings will not be reversed unless the trial court has clearly abused its discretion. See U.S. v. Koziy, 728 F.2d 1314 (11th Cir.1984); Hodges v. U.S., 597 F.2d 1014 (5th Cir.1979). In neither of these cases, however, was the fact pattern as to the time of disclosure of the independent expert even remotely similar to the fact pattern in this case. Several factors must be weighed in analyzing whether the exercise of discretion in these cases on the part of the trial judge is proper, those factors include, but not being limited to,
 
 
 81
 1. the surprise to the party against whom the witness was to testified,
 
 
 82
 2. the ability of the party to cure that surprise,
 
 
 83
 3. the extent which allowing the testimony would disrupt the trial,
 
 
 84
 4. the explanation for the party's failure to name the witness, and
 
 
 85
 5. the importance of the testimony.
 
 
 86
 See Koziy, supra, at 728 F.2d 1320-21. Murphy v. Magnolia Electric Power Association, 639 F.2d 232, 235 (5th Cir.1981); Meyers v. Penneypack Woods, 559 F.2d 894, 904 (3rd Cir.1977).
 
 
 87
 Under the first factor, it is difficult to conclude that Baker, Watts' tender of an independent expert could have caused a great deal of surprise to the plaintiffs. The manner in which the case evolved, and particularly the various colloquies between counsel and the court concerning Mr. Casgar put the plaintiffs on notice that it was possible that an independent expert would be testifying at some point in the Baker, Watts case.
 
 
 88
 The second factor presents more difficulty. The independent expert witness was tendered only on 15 May 1985, although he had been identified to the plaintiffs' counsel on 13 May 1985, 15 May 1985 being very near the close of the second trial. Even though counsel for the plaintiffs may have anticipated that such an independent expert would be tendered at some reasonable time after 29 April 1985, Baker, Watts' failure to identify that independent expert until 13 May 1985 could well have limited plaintiffs' abilities to counter that expert's testimony. The background and qualifications of both Cheek and Casgar were known to plaintiffs' counsel, but that appears not to have been true as to the independent expert.
 
 
 89
 Under the third factor, there is nothing in the record to indicate that allowing the testimony of the independent expert would have disrupted or delayed the trial.
 
 
 90
 Under the fourth factor, nothing in the record explains, satisfactorily or otherwise, Baker, Watts' failure to name the independent expert witness before 13 May 1985. This is damaging to Baker, Watts' arguments here in light of the colloquies which had occurred previously between Baker, Watts' trial counsel and the court.
 
 
 91
 In dealing with the fifth factor, it is important to bear in mind the holding of the court stated supra, to the effect that an expert witness would not be permitted to testify so as to state a conclusion of law, or the meaning and applicability of the securities laws to the facts in this case. Mr. Casgar was permitted to testify as a fact witness extensively on the practices of the trade and profession, and on the manner in which a transaction such as this was put together. Having previously indicated that Casgar's testimony was properly limited to this area, the testimony of the independent expert witness would likewise be so limited. Considering the length of Casgar's testimony, as revealed in the joint appendix, it is reasonable to assume that the testimony of the independent expert, delimited as noted above, would have been simply cumulative. It might be argued that the cumulative effect would be helpful, in that Casgar was "an individual who is involved in the litigation," so that his testimony might be felt by the jury to be perhaps less credible. However, from detailed review of the joint appendix, it appears that there was little or no controversy concerning the admissible portions of Casgar's testimony. In other words, there was not any serious conflict from any other witness concerning Casgar's admissible testimony. Where additional testimony might well be desirable to bolster the credibility of a witness whose testimony has been controverted, there is far less reason to cumulate the evidence where the testimony of the first witness had not been controverted in any substantial matter, as was the case here.
 
 
 92
 Consequently, we cannot conclude that the trial court abused its discretion in denying the use of the independent expert witness, both because that witness had not been disclosed to plaintiffs' counsel until two days before the actual tender of the witness very close to the end of the trial, and because the testimony of that independent expert witness would have been cumulative of the uncontroverted admissible testimony of Mr. Casgar.
 
 
 93
 As a consequence of this analysis of the five factors indicated in Koziy, supra, the court concludes that the trial court did not abuse its discretion in rejecting the evidence of the independent expert witness.
 
 
 94
 One minor point should be further explicated here. The court below indicated as a reason for preventing the testimony of Casgar as an expert witness the fact that he was "an individual who is involved in the litigation." This court is aware of no authority, nor has any been advanced, indicating that simply because a person has such involvement he is necessarily precluded from qualification as an expert. In other fact situations, where the proposed expert witness might be so involved, opposing counsel could well attack the credibility of that witness as to his admissible evidence, not only with evidence contravening that which the witness had given, but also in argument to the jury. Here, however, as stated supra, there was little or no contravening of Casgar's admissible testimony. Consequently, there was little or no reason to argue credibility of Casgar to the jury. Such questions of credibility, of course, usually go to the weight to be given to the offered testimony, and not to the admissibility of the expert witness testimony.
 
 
 95
 C. The District Court's determination of the plaintiff's damages
 
 
 96
 Section 12(2) plainly indicates that a plaintiff may attempt to recover the consideration he paid for a security, "less the amount of any income received thereon". The court below instructed the jury to disregard "any tax benefits the plaintiffs may have enjoyed as a result of the investment in these partnership interests."
 
 
 97
 Very few cases have dealt with the question of offsetting a damage award in the securities cases with tax benefits received by a plaintiff. We take time now to discuss briefly these cases. In Austin v. Loftsgaarden, 675 F.2d 168 (8th Cir.1982), the plaintiffs brought a securities fraud action against the organizer of a partnership in a real estate tax shelter. At trial, the defendant attempted to show that the plaintiffs were, in fact, money ahead by virtue of the tax benefits they had received, even though the investment itself had failed. The jury found the defendant liable for violation of Section 12(2), and awarded damages to the plaintiff. On appeal, the Eighth Circuit affirmed the liability findings, but set aside the damages award, holding that the District Court erred in "refusing to allow proof of any economic benefits received by plaintiffs on account of the investment and in failing to instruct the jury that the damages award must be reduced by any value shown to have been received by plaintiffs." 675 F.2d at 181. The Court also held that Sec. 12(2) "implicitly" incorporates the principle of "actual damages" and that "income received", as used in the statute, should be construed to include tax benefits bargained for and received in a tax shelter investment. "[I]n a private securities fraud action involving an investment structured and marketed as a tax shelter, where a rescissory measure of damages is applied, evidence of any benefit derived by the plaintiff/investor via tax savings must be permitted." Id. at 183-84 (emphasis added).
 
 
 98
 The Ninth Circuit reached a contrary result in Burgess v. Premier Corporation, 727 F.2d 826 (9th Cir.1984). There, investors in a tax shelter arrangement brought suit under Sec. 10(b) of the 1934 Act, and the same issue arose. The jury found in favor of the plaintiffs, and the court awarded rescission damages. On appeal, the defendants argued that the tax benefits which the investors enjoyed should be deducted from the damage award. The court there noted the Austin decision, but refused to follow it, holding instead that deduction of the tax benefits under these circumstances would be inappropriate, since subtracting tax benefits from a damage award would place an unfair burden on taxpayers generally.
 
 
 99
 The analysis of the court in Burgess is set out in the following quotation, at p. 838,
 
 
 100
 At first appearance it seems inequitable to award the doctors $496,128 (their pretax out of pocket loss) when their after tax out of pocket losses are estimated at only about $157,000; but to simply subtract the tax benefits from damages would place an unfair burden on taxpayers generally. Specifically, the doctors would only be returned to their original position by maintaining their claimed tax losses in addition to the out of pocket losses awarded. Such a result leaves the government bearing the cost of defendants' fraud. A better result is to set damages equal to the doctors' losses exclusive of tax benefit. The doctors will not receive a double benefit from this measure of damages because under the tax benefit rule, their prior tax benefits will be disallowed. Although this court cannot directly disallow the prior tax benefits because plaintiffs' tax liabilities are not directly before us, we presume that the IRS will do its duty if the doctors should actually recover on their judgments and thereafter fail to file amended returns as required by law.
 
 
 101
 In dealing with the Austin decision, the Burgess court went on to say, at p. 838, as follows:
 
 
 102
 The Eighth Circuit in Austin v. Loftsgaarden, 675 F.2d 168 (8th Cir.1982), did allow tax benefits to be offset against damages in a securities fraud arising from a real estate tax shelter....
 
 
 103
 While we agree that consideration of tax consequences is relevant for certain purposes, we decline to make the government the banker for fraudulent tax shelter activity. Judge Hardy's analysis in Western Federal Corp. v. Davis, 553 F.Supp. 818, 820 (D.Ariz.1982), is correct in discerning that the economic benefit by way of tax deductions is illusory because amended returns will have to be filed under the tax benefit rule. Mertens Law of Federal Income Tax, Sec. 7.37.
 
 
 104
 Lastly, the Second Circuit has considered the issue in a case somewhat analogous to the case at bar, Salcer v. Invecon Equities Corp., 744 F.2d 935 (2nd Cir.1984). That action proceeded on an allegation of fraud concerning a tax shelter investment under Sec. 10(b) of the 1934 Act. The court held that civil damages, under the language of Sec. 28(a) of the 1934 Act are limited to "actual damages on account of the fact complained of." The court indicated that the reference to "actual damages" in Section 28(a) in fact meant "compensatory damages" and reached the conclusion that a plaintiff could not recover under Sec. 28(a) more than his net economic loss.
 
 
 105
 Of the three cases cited above, only Austin proceeded under Sec. 12(2) of the 1933 Act. In both Burgess and Salcer, the plaintiffs alleged fraud under Sec. 10(b) of the 1934 Act. In contrast to Sec. 10(b), Sec. 12(2) of the 1933 Act at issue here, specifically indicates that the recovery may be for the consideration paid for the security with interest thereon, "less the amount of any income received thereon". In light of the different structure and language of the 1933 and 1934 Acts, illustrated by Sec. 28(a) of the 1934 Act, both Burgess and Salcer bear only indirectly on the question to be resolved here, though the Burgess court analysis on this issue is instructive in considering the same question where it arises under Sec. 12(2) of the 1933 Act. Allowing the setting off of the tax benefits against the plaintiffs' award in this case would create precisely the problem stated and resolved in the Burgess court discussion, i.e., in order to be made whole, the plaintiffs would maintain their previously taken tax losses, to the detriment of the government, leaving "the government bearing the costs of defendant's fraud."
 
 
 106
 Further, we disagree with the Eighth Circuit's holding in Austin for an additional reason, since, in this court's view, it inappropriately broadens the meaning of "income received", and thus impermissibly extends the scope of the statute beyond that which the language or legislative history of Sec. 12(2) would support. We can find no adequate support for the Austin court's conclusion that the term "income received" was intended by Congress to include any "economic benefits" and "any value shown to have been received by plaintiffs." 675 F.2d at 181. We thus follow in our decision here the maxim that the ordinary meaning of statutory language must control, absent some clear evidence of a contrary legislative intent.[1]
 
 
 107
 Had Congress intended such a broad construction as that employed in Austin, we believe it would not have used the phrase "income received" and instead would have used language encompassing any benefit received, monetary or otherwise. It is true that income may exist in the form of an "economic benefit", or some "value" to the plaintiffs, but in the normal use of the word "income", the "benefit received" concept is much broader than "income received". If the generally accepted definition of "income received" is to be followed, as we find it must, absent some indication by Congress to the contrary, we thus believe that tax benefits should not be considered in determining the amount of plaintiffs' damages under Sec. 12(2). Rather, the limitation on plaintiffs' recovery under a rescission theory in this case would be the consideration paid for the security, plus accrued interest, less the amount of any income actually received thereon. The court below thus correctly computed the amount to be charged against Baker, Watts and appropriately did not consider the asserted tax benefits.
 
 
 108
 D. The District Court's Instruction on the issue of causation
 
 
 109
 The trial court below instructed the jury that Baker, Watts misrepresented or omitted a fact which could be material in its Confidential Offering Memorandum. Further, the jury was charged that an omitted fact is material under Sec. 12(2):
 
 
 110
 if there is a substantial likelihood that it would have assumed actual significance in the deliberations of a reasonable investor or that its disclosure would be viewed by a reasonable investor as having significantly altered the total mix of information available. If you find that a reasonable investor would attach importance to the omitted fact in making an investment decision, then you may find that the omitted fact was material.
 
 
 111
 Finally, the judge instructed the jury that the plaintiffs did not need to prove that they had actually relied upon the omission.
 
 
 112
 Under Section 12(2), plaintiffs need not prove that they relied upon defendant's alleged misstatement or omission. See, e.g., Sanders v. John Nuveen & Co., Inc., 619 F.2d 1222, 1225 (7th Cir.1980); Johns Hopkins Univ. v. Hutton, 422 F.2d 1124, 1129 (4th Cir.1970). In Johns Hopkins, for example, the defendants argued that their representations to the university did not cause it to invest, but rather that the university relied on its own advisers and their information. This court, however, rejected that argument, which we found to be "an impermissible attempt to introduce reliance upon the misrepresentations and omissions as a necessary element of Sec. 12(2)." 422 F.2d at 1129. Similarly, the Fifth Circuit has held that "a causation test should not be read into Sec. 12(2). A plaintiff does not have to prove that the sale would not have occurred absent the misrepresentation or omission." Hill York Co. v. American International Franchises, 448 F.2d 680, 696 (5th Cir.1981).
 
 
 113
 In Johns Hopkins, the court went on to hold that, as a matter of law, the plaintiffs had established "sufficient causal relationship" between the defendant's violation and the injury. The court held that the University did not need to prove also that the misrepresentation or omission had a "decisive effect" on the decision to purchase. This language is essentially dictum in the Johns Hopkins opinion, but has been used by Baker, Watts to support its argument that in this Circuit, a Sec. 12(2) plaintiff must prove some causal relationship between the defendants' violations and the plaintiff's purchase.
 
 
 114
 If we accept the argument of Baker, Watts in this respect, it is clear from the record that the Confidential Offering Memorandum was intended to be instrumental in affecting the sale of Partnership units. The Memorandum served as a sort of prospectus, was the only document to be used in soliciting investors, and was provided to each investor.
 
 
 115
 Baker, Watts' argument on this point distills down to the proposition that each of the plaintiffs in this case had to demonstrate, by a preponderance of the evidence, that the omissions were material to his or her decision. However, under Johns Hopkins, this argument is "an impermissible attempt to introduce reliance upon the misrepresentations ..." 422 F.2d at 1129.
 
 
 116
 Based upon the facts elicited at trial, and upon the jury's finding of the "materiality" of the omitted facts, we find no error in the court's ruling on this issue below.
 
 
 117
 E. Alleged errors with respect to Plaintiffs Bowes and Dilatush
 
 
 118
 At trial, neither Mr. Bowes or Mr. Dilatush testified, joining a number of other plaintiffs who likewise did not testify. Those plaintiffs who did testify at trial asserted that they had no knowledge of the defendant's misrepresentation or omission, thus complying with the doctrine of Johns Hopkins. See also Junker v. Krory, 650 F.2d 1349, 1359 (5th Cir.1981). The charge to the jury asserted that the plaintiffs had to prove "they did not know of misrepresentations ... prior to the time of their purchase or during the time of the offering". No distinction was made in that portion of the charge between those plaintiffs who testified and those who did not testify.
 
 
 119
 Further, there exists evidence in the record from which an inference could be drawn as to the knowledge of the non-testifying plaintiffs. The record reflects that only two of the Baker, Watts personnel knew of the negotiations for the sale of the stock to Biondi, and both of them testified that they had intentionally told no one about the negotiations. Thus, if the jury accepted the witnesses' testimony, the inference is strong that neither Bowes nor Dilatush, nor any of the other plaintiffs, non-testifying or not, had knowledge of the misrepresentations or the omissions at the time of their investments.
 
 
 120
 Secondly, the court below apparently misperceived the record in concluding that neither Bowes nor Dilatush had invested in the partnership interest. In fact, the record discloses that each had invested in the partnership, one having invested $75,000 and the other $150,000. However, the court entered a directed verdict against Bowes and Dilatush, thus barring any recovery by them against Baker, Watts.
 
 
 121
 Since we perceive no sustainable basis for such disparate treatment of plaintiffs Bowes and Dilatush, the action of the court below in granting a directed verdict as to these two plaintiffs is reversed.
 
 IV. CONCLUSION
 
 122
 For the reasons set forth above, we sustain the court below in its finding that Baker, Watts was a seller within the meaning of Sec. 12(2), we affirm the court below for its refusal to permit Baker, Watts to call an expert witness as to the legal implications of non-disclosure, we affirm the court in its decision to disregard the tax benefits received by the plaintiffs as a result of their investment in the limited partnership, we affirm the court on its rulings as to causal relationship, and we reverse the court on its direction of a verdict against Bowes and Dilatush.
 
 
 123
 Because of the conclusions set out here, we remand the case for such further proceedings as may be consonant with this opinion.
 
 
 124
 AFFIRMED in part; REVERSED in part and REMANDED for further proceedings.
 
 
 
 [1]
 At the time of preparation of this opinion, Austin had been granted certiorari, sub nom. Randall, et al. v. Loftsgaarden, et al. On 2 July 1986, the Supreme Court decided the case, reversing the Austin opinion, holding that the language "any income received thereon" did not encompass "tax benefits" received by the plaintiff-investor. Randall, et al. v. Loftsgaarden, et al., --- U.S. ----, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986) (Brennan, J. dissenting)