896 F.2d 1368
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carl E. McAFEE, Defendant-Appellant.
 No. 88-5145.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 3, 1989.
Decided: Feb. 9, 1990.
 
 Guy M. Harbert, III; S.D. Roberts Moore (Gentry, Locke, Rakes & Moore; John P. McGeehan, on brief), for appellants.
 Karen Breeding Peters, Assistant United States Attorney (John P. Alderman, United States Attorney, on brief), for appellee.
 Before MURNAGHAN and CHAPMAN, Circuit Judges, and EDWARD S. NORTHROP, Senior United States District Judge for the District of Maryland, sitting by designation.
 CHAPMAN, Circuit Judge:
 
 
 1
 Carl E. McAfee, a practicing attorney in Norton, Virginia appeals his convictions of: (Count 1) being an accessory after the fact of the unlawful importation and distribution of marijuana by Wallace and Olga Thrasher in violation of 18 U.S.C. Sec. 3; (Count 2) interstate travel to facilitate Olga Thrasher's drug business in violation of 18 U.S.C. Secs. 1952 and 2; (Count 4) assisting Olga Thrasher in the structuring of a financial transaction so as to conceal drug assets in violation of 18 U.S.C. Secs. 1001 and 2; and (Count 5) aiding and abetting Olga Thrasher in causing the Bank of Speedwell, Wytheville, Virginia, not to file the required I.R.S. Form 4789 for a currency transaction in excess of $10,000 in violation of 18 U.S.C. Sec. 2 and 31 U.S.C. Secs. 5313 and 5322(a). At trial he was acquitted on a mail fraud charge (Count 3).
 
 
 2
 Appellant claims the district court erred (1) in refusing to order a new trial because of improper conduct by the prosecutor, (2) because of a juror's failure during voir dire examination to disclose her relationship with an Assistant United States Attorney, and (3) in refusing to admit into evidence an attorney's expert testimony regarding the conduct of a reasonably prudent attorney in Southwest Virginia in 1984. He also claims (4) that the double jeopardy clause prohibited a conviction under Count 4, (5) that his convictions under Counts 4 and 5 violated his right to due process because the language of the statute is so unclear that ordinary people cannot understand it, and (6) that the evidence was insufficient to support convictions on any of the counts. We find no merit to any of the exceptions, and we affirm.
 
 
 3
 * An exhaustive recitation of the facts is unnecessary to an understanding of the case, but the following are provided. On October 17, 1984, a private plane loaded with marijuana crashed on Fancy Gap Mountain in Southwest Virginia. An unidentified body and a large load of marijuana were found on the crash site. Nelson King, who had survived the flight, contacted Wallace Thrasher at his home, proceeded there and received first aid. Wallace Thrasher and King left the area to go into hiding. Wallace Thrasher was the husband of Olga Thrasher, he was the owner of the plane that crashed, and he was involved in the importation and sale of marijuana.
 
 
 4
 After finding the wreckage of the plane, police officers contacted Mrs. Thrasher, and she advised them that her husband was away on a business trip and she did not know when he might return. Pursuant to her husband's instructions, Olga retained Max Jenkins, a Radford, Virginia, lawyer to represent her husband in connection with any criminal liability arising from the crash. Jenkins was also to represent Olga with respect to her possible criminal exposure.
 
 
 5
 Olga testified that her last contact with her husband was a telephone call in which he stated that he was returning to the country of Belize to explain the plane crash to his marijuana suppliers, and to arrange another load of marijuana. Shortly after this call, Olga was informed that her husband had died in a plane crash in Belize and she arranged for a memorial service in Wytheville, Virginia. Attorney Jenkins suggested that they confirm Mr. Thrasher's death and advised that they contact the appellant Carl McAfee, because he was a lawyer experienced in dealing with foreign governments.
 
 
 6
 Olga Thrasher met with appellant and explained her husband's smuggling business, including the fact that most of their property had been purchased with drug proceeds. She testified that appellant advised her of the possibility of her assets being seized by the government, and he advised that her position would be improved by obtaining a copy of a death certificate for her husband. Efforts were made to obtain more information about Thrasher's death without success.
 
 
 7
 Olga Thrasher was concerned with disposing of an Aztec airplane and a number of parts, particularly special avionics and long range fuel tanks. She wanted the aircraft overhauled and the parts installed so that it could be used for future drug deals. Appellant owned an interest in an air charter business at Lonesome Pine Airport in Wise, Virginia. He suggested that the plane be moved to Lonesome Pine where his mechanic would do the necessary work. He also wanted to put a lien for services on the aircraft to prevent its seizure and to secure his fees. Douglas Griffin owned an interest in the plane and had it moved because he did not trust Mrs. Thrasher. The parts were moved to the airport at Lonesome Pine, but were subsequently removed to Florida, without appellant's knowledge.
 
 
 8
 Following word of her husband's death, Mrs. Thrasher did not wish to continue living in an isolated area of Bland County, and she contracted to purchase a condominium in Wytheville for $85,000. She discussed the transaction with appellant and he suggested that any newly acquired property might be seized and recommended that she obtain a loan on the property or form a corporation to buy it. Mrs. Thrasher was in a hurry and she wished to close the transaction with a series of cashier's checks. She testified that appellant did not want her to purchase cashier's checks, but that he advised her to purchase in amounts less than $10,000 and that she should go to different branches of several banks so as to avoid the requirement that banks report to IRS the purchase of any check for cash in excess of $10,000. Mrs. Thrasher and her housekeeper purchased the necessary checks using different branches of three banks. Sovran Bank and Bank of Virginia realized what had happened and treated the purchases at their branches as one transaction and filed the IRS Form 4789. The Bank of Speedwell did not file this form. The real estate transaction was closed and the purchase price paid by the various cashier's checks.
 
 
 9
 In January 1985, Mrs. Thrasher was served with a subpoena from the federal grand jury in Roanoke. The subpoena directed her to bring evidence, including a death certificate, relating to the alleged death of her husband. She testified that appellant suggested that they travel to Jamaica to obtain a false death certificate. She called Douglas Griffin and he suggested that she contact his marijuana connection in Jamaica. Appellant advised her to have the contact set up a meeting with a Jamaican attorney to assist them in obtaining a false death certificate. Later, Jenkins, Mrs. Thrasher, and appellant flew to Jamaica and obtained two copies of a death certificate showing that Wallace Thrasher had died as a result of a "tragic accident." One copy of the death certificate was given to Jenkins and the appellant kept the other. When Mrs. Thrasher appeared before the federal grand jury, she acted upon appellant's instructions and claimed her Fifth Amendment right not to testify. No mention was made at that time of the death certificate, but she later used it to consummate the sale of a house in Florida and to support a claim on a policy of credit life insurance issued to her husband. She testified that she did this pursuant to appellant's instructions. In March 1985 she discontinued her client-attorney relationship with appellant. Shortly thereafter she was arrested when she attempted to arrange the kidnapping and murder of Nelson King, whom she believed to be lying about her husband's disappearance. She entered into a plea agreement with the federal prosecutor and cooperated in the prosecution of appellant.
 
 
 10
 Following a lengthy trial, McAfee was convicted of four of the five counts in the indictment. Approximately ten days after the jury verdict, appellant and his trial attorney were advised that Thomas Bondurant, an Assistant United States Attorney in the Roanoke office, had been romantically involved with Lyn Jackson, one of the jurors at McAfee's trial. Lyn Jackson was well known in the Roanoke area because she was one of the evening news anchors at a local television station. She knew a number of lawyers and was known by them because she frequently covered stories arising from litigation and criminal prosecutions. Assistant United States Attorney Bondurant was also well known in the area, but he was not actively involved in the McAfee trial. He had interviewed one of the government's primary witnesses prior to trial but did not assist in the selection of the jury or in the presentation of the case. McAfee made a motion for a new trial claiming that Lyn Jackson was a biased juror and that this bias deprived him of his constitutional right to a fair trial before an impartial jury. He claimed that this information was known to the United States Attorney's office, but not known to him and could not have been discovered by him through the exercise of due diligence.
 
 
 11
 The trial judge ordered an evidentiary hearing and subpoenaed juror Jackson to testify. The court also reviewed the transcript of the voir dire proceedings when the jury was selected. Lyn Jackson testified and acknowledged a relationship with Bondurant that had ended two and a half years prior to trial. She described the relationship as having lasted a couple of months and not being serious. The record reflects that during the voir dire of the venire, Jackson was the first prospective juror to volunteer information in response to several questions asked by the court. She advised that she knew a number of lawyers and was known by them. She identified the defense attorney and Assistant United States Attorney Pierce, who was prosecuting the case, as persons known to her. She also advised the court at the time of the voir dire examination that she knew of Olga Thrasher because of various news reports.
 
 
 12
 During the voir dire examination, the court asked the venire about contacts with the United States Attorney's Office or the law office of the defendant and explained "contacts" as follows:
 
 
 13
 All right. Well, let me say this, the fact that you may have seen someone--I'm talking more about professional or social contact on an individual basis.
 
 
 14
 The fact that you have seen a name in the paper or whatever, been in the courtroom, is not the type of information I am really looking for.
 
 
 15
 With that caveat, do we have any more hands?
 
 
 16
 All right, have any of you had any dealings of any kind with the United States Attorney's office in Roanoke, Virginia: had any occasion to have any type of contact with the office for which Mr. Pierce works?
 
 
 17
 Juror Jackson did not respond to this question and her failure to respond is the crux of the appellant's claim that she failed to disclose pertinent information and was thereby seated as a juror and prevented him from receiving a trial before an unbiased jury.
 
 
 18
 Lyn Jackson testified that she thought she had already identified contacts with the United States Attorney's Office and had already answered the question. She thought the court was repeating the question to other jurors who had not volunteered information. She stated that she thought after she had volunteered so much information that no one needed or wanted to hear any more from her, that she had answered all of the questions honestly as she understood them, and that she had not thought of Mr. Bondurant during the voir dire examination. She testified that she had no prior knowledge of appellant and no bias against him.
 
 
 19
 Bondurant testified that their dating relationship had ended two and a half years before, that he occasionally talked with her by telephone but he had not seen her for more than a year prior to the trial. Assistant United States Attorney Pierce testified that he knew that Bondurant and Jackson had dated some years previously, but this information did not seem significant to him, and he did not understand the judge to have asked for information on social contacts with persons not in the courtroom.
 
 
 20
 After hearing all of the testimony, the trial judge filed a memorandum opinion denying appellant's motion for a new trial. In the opinion the judge found as a fact that the question he proposed to the venire inquiring "about professional or social contact on an individual basis" asked for information that Jackson failed to disclose, but that her failure to provide the information was not intentional and was due to either misunderstanding of the question or inattentiveness. He further found that Jackson honestly answered the voir dire questions to the best of her memory and understanding and that there was no evidence of actual bias on her part. The court also found that if Jackson had been struck from the jury and replaced by another juror, there would have been no difference in the outcome of the trial.
 
 II
 
 21
 At the hearing on the motion for a new trial, eight people, including the defendant, testified. The court's findings of fact from that hearing are subject to review under the clearly erroneous standard of Federal Rule of Civil Procedure 52(a). This standard is particularly appropriate in the present case because the trial judge who conducted the post-trial hearing is the same judge who presided over the trial and conducted the voir dire examination of the venire. He is in the best position to consider credibility and to weigh the evidence as to any bias.
 
 
 22
 The trial judge, following the dictates of Smith v. Phillips, 455 U.S. 209 (1982), and Remmer v. United States, 347 U.S. 227 (1954), conducted a hearing at which all parties were permitted to participate. The district court found that the failure of juror Jackson to answer one question during the voir dire was the result of either a misunderstanding of the question or inattentiveness. The court also found that Jackson was not biased against the defendant and that striking juror Jackson and replacing her with another juror would have made no difference in the outcome of the trial.
 
 
 23
 These findings are supported by the record and are not clearly erroneous. The record reflects that Lyn Jackson was the first person on the venire to answer the court's inquiry about knowledge of the attorneys involved in the case. She stated that she knew both Assistant United States Attorney Pierce and Moore, the defendant's attorney. When the court inquired as to knowledge of Olga Thrasher, Jackson was again the first to state that she remembered the Olga Thrasher case. Upon direct inquiry from the court, she stated that she could disregard any prior knowledge and decide the present case fairly. When the court asked about publicity surrounding Wally Thrasher's plane crash at Fancy Gap Mountain, Jackson again was the first to answer that she remembered it. When the names of certain witnesses were revealed, Jackson admitted that she knew prospective witness Keith Neely. When the venire was asked if anyone had a good friend who was a lawyer, she answered, "I know a lot of lawyers." There was no follow-up question to Jackson about lawyers, although there were follow-up questions asked to others on the venire who had admitted knowing lawyers.
 
 
 24
 In her testimony in the post-trial proceeding, Lyn Jackson stated that she had dated Thomas Bondurant for two and a half to three months in the fall of 1985. She stated that the relationship was not serious and that she had not seen Bondurant for more than a year prior to the trial.
 
 
 25
 The question that prompted the post-trial inquiry came after the court had asked the prospective jurors if they knew the lawyers. Jackson responded: "I have dealt with them professionally." The court then asked her if they had represented her personally and she answered in the negative. There were then other jurors who indicated that they had seen the Assistant United States Attorney Pierce in the courtroom because of prior jury service. The court made the inquiry to the venire that has been previously set forth on page eight.
 
 
 26
 Appellant contends that this inquiry required Jackson to reveal the fact that she had dated Assistant United States Attorney Bondurant, who was not in the courtroom and did not participate in the prosecution, even though their relationship had lasted only two to three months and had ended two and a half years prior to the trial. Since the juror had provided so much information in response to other questions, and had advised that she knew both attorneys in the present case and many other lawyers, it is understandable that she thought that the court's question was directed to others on the venire. Appellant argues that there was a substantial likelihood of bias and that the nondisclosure was intentional and required a new trial. Such a position would impute bias to a juror, and this is contrary to the holding of Smith v. Phillips, which found that bias is not to be imputed and that the opportunity to prove actual bias guarantees the defendant's right to an impartial jury. 455 U.S. at 216. McAfee was given this opportunity in the post-trial hearing at which he and seven others testified, and this procedure met the due process standard of Smith v. Phillips:
 
 
 27
 Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be at a hearing like that ordered in Remmer and held in this case.
 
 
 28
 Id. at 217.
 
 III
 
 29
 We find no merit to the claim that prosecutorial misconduct requires a new trial. Appellant claims that certain questions asked of him during cross-examination were so irrelevant and prejudicial that the only proper remedy for such conduct is the granting of a new trial. The trial judge sustained objections to some of the questions and gave instructions for the jury to disregard them. Some of the questions were the result of the defense attorney's rather personal assault on the prosecutor, on the government's case, and on the witnesses used to support it. As to certain other questions, the government had filed with the court a sealed letter setting forth the foundation of its belief that these questions were relevant. We have reviewed the "foundation letter" and when we consider its contents, we find that the trial judge did not abuse his discretion in permitting the prosecution to pursue the subject to which the defense objected on the cross examination of McAfee.
 
 IV
 
 30
 We find no error in the trial judge's refusal to allow expert testimony from an attorney that a prudent lawyer in Southwest Virginia would have advised clients wanting to structure cash transactions using the proceeds of illegal drug sales that they should purchase cashier's checks of less than $10,000 each in order to avoid the filing of a Currency Transaction Report required by the Internal Revenue Service. This expert testimony was proffered as a defense to Counts 4 and 5 which charged McAfee with aiding and abetting Olga Thrasher in purchasing cashier's checks of under $10,000 from different banks so as to prevent the banks from filing the IRS Form 4789 as required by 31 U.S.C. Sec. 5313.
 
 
 31
 Such testimony could only confuse the jury. There was no testimony that the defendant had researched the law on this point or had consulted with any other attorneys before advising Olga Thrasher to structure her purchase of the townhouse so as to avoid reporting the large amount of cash involved. An expert witness is not permitted to give an opinion as to what the applicable law may mean. See Adalman v. Baker, Watts & Co., 807 F.2d 359, 366 (4th Cir.1986). Also, such testimony would conflict with our prior opinion, No. 87-5572, decided October 20, 1987, in United States v. McAfee, in which we reversed the district court's dismissal of Counts 4 and 5 and concluded that by operation of 18 U.S.C. Sec. 2(b) the defendant's willful intent to cause a concealment, combined with the bank's duty to report such a cash transaction, and its innocent failure to report, constituted the necessary elements of actionable concealment under 18 U.S.C. Sec. 1001.
 
 V
 
 32
 Appellant argues that Count 4 is a lesser included offense of Count 5 and that the prohibition against double jeopardy requires that the Count 4 conviction be merged into the Count 5 conviction. This question is addressed by Blockburger v. United States, 284 U.S. 299 (1932), which directs us to focus on the formal elements of the two crimes to determine if they require proof of the same essential facts, or if one requires proof of a fact which the other does not.
 
 
 33
 Count 4 charges that the appellant aided, abetted and counseled Olga Thrasher in making a false and fraudulent representation in a matter within the jurisdiction of the U.S. Treasury Department by using a scheme or device to conceal from the Treasury the transfer of U.S. currency in excess of $10,000 by concealing from the banks the fact that numerous cashier's checks of less than $10,000 were being used to structure a single transaction in violation of 18 U.S.C. Secs. 1001 and 2. In Count 5 appellant is charged with aiding, abetting and counseling Olga Thrasher to cause the Bank of Speedwell not to file the Currency Transaction Report form 4789 in violation of 18 U.S.C. Sec. 2 and 31 U.S.C. Secs. 5313 and 5322(a). Count 4 requires the use of a scheme or device to conceal the transaction. This scheme or device is the additional element that is not required by Count 5, which only requires a willful attempt to cause a bank to fail to file Form 4789.
 
 
 34
 Our facts are similar to and controlled by United States v. Woodward, 469 U.S. 105 (1985), which involved a violation of another currency reporting statute, 31 U.S.C. Sec. 1085, and requires a report when more than $5,000 in currency is brought into the United States. Woodward was stopped on his arrival at the Los Angeles International Airport upon his return from Brazil. He had answered in the negative the usual customs form inquiring if he was carrying over $5,000. Further investigation revealed that he had $12,000 in his boot. He was indicted under 18 U.S.C. Sec. 1001 for making a false statement to an agency of the United States and for failing to report that he was bringing in excess of $5,000 into the United States in violation of 31 U.S.C. Sec. 1058. The court held that Woodward's conduct could be punished under both statutes because Sec. 1001 required proof that the material fact be concealed by a trick, scheme or device, and conviction under 31 U.S.C. Sec. 1058 required only proof of the willful transportation of money into the United States without filing the required currency report. The court found that the two code sections were directed at separate evils, and "[a]ll guides to legislative intent reveal that Congress intended respondent's conduct to be punishable under both 18 U.S.C. Sec. 1001, and 31 U.S.C. Secs. 1058, 1101 (1976 ed.)." 469 U.S. at 109-110. This same reasoning is applicable to our facts.
 
 VI
 
 35
 After a careful review of the record, we are persuaded that there is sufficient evidence to sustain the defendant's convictions on Counts 1, 2, 4, and 5. Count 1 charges defendant with being an accessory after the fact in violation of 18 U.S.C. Sec. 3 which provides that: "[w]hoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." It is alleged in Count 1 that appellant knew that Wallace and Olga Thrasher had unlawfully imported and distributed marijuana, that the defendant knowingly and willfully assisted Olga Thrasher in order to hinder or prevent her apprehension, trial, and punishment by assisting in obtaining a false death certificate for Wallace Thrasher to lull law enforcement officers in the investigation of Wallace and Olga Thrasher, by advising Olga Thrasher as to the secreting of proceeds from the unlawful importation and sale of marijuana, and by assisting Olga Thrasher in secreting an Aztec airplane and parts that were a part of the marijuana enterprise. To prove the charge of accessory after the fact, it was necessary to prove that the defendant, knowing of the illegal activities, committed only one of the three alleged acts with the intent to hinder the apprehension, trial, or punishment of Olga Thrasher. There is ample testimony, including that of the appellant, that he traveled to Jamaica with Olga Thrasher and assisted in obtaining a false death certificate for Wallace Thrasher. There is also evidence from which the jury could draw a reasonable inference that one of the purposes for this false death certificate was to persuade law enforcement authorities that Wallace Thrasher was dead and that the investigation of his activities and those of Olga should end. There was extensive evidence of appellant's assistance to Olga in secreting the drug proceeds.
 
 
 36
 Count 2 charges a violation of 18 U.S.C. Sec. 1952. This section forbids interstate and foreign travel in aid of racketeering enterprises. To convict, it was necessary to prove that McAfee traveled in interstate or foreign commerce with the intent to (1) distribute the proceeds of an unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in sub-paragraphs (1), (2) and (3). McAfee argues that his conviction was unlawful because there was no proof of an unlawful act after he traveled to Jamaica. McAfee argues that the entire travel from Virginia to Florida to Jamaica and back to Virginia was one trip and it was necessary for the government to prove that he committed an act to carry out the unlawful activity after completion of the trip. This statute, 18 U.S.C. Sec. 1952, is not subject to such narrow interpretation. Each leg of the journey that involved interstate or foreign travel was sufficient to set the statute in motion. The acts of McAfee in obtaining the false death certificate in Jamaica occurred after he had been involved in both interstate and foreign travel. Appellant's own testimony was sufficient to show interstate and foreign travel with intent to facilitate the promotion of the Thrasher drug business and the subsequent performance of an act in furtherance of the drug business.
 
 
 37
 We have already discussed Counts 4 and 5 and they are adequately supported by the evidence.
 
 
 38
 AFFIRMED.